UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Todd Lynch,<br>    *Plaintiff*,<br>    *v.*<br>Margaret Ackley and the City of New London,<br>    *Defendants*. | Civil No. 3:12cv537 (JBA)<br><br>December 13, 2012 |

**RULING ON MOTION TO DISMISS**

Plaintiff Todd Lynch brings a seven-count Amended Complaint [Doc. # 28] against Chief of Police Margaret Ackley and the City of New London ("City"), alleging that Chief Ackley improperly retaliated against him based on his constitutionally protected speech and associational conduct, and that Chief Ackley libeled him in e-mails sent to a local reporter. Defendants move [Doc. # 33] to dismiss all of Officer Lynch's claims for relief. For the reasons below, Defendants' motion will be denied.

**I.     Factual Allegations**

Plaintiff Lynch alleges the following in his Amended Complaint [Doc. # 28]. Plaintiff, a New London police officer since 2007 and the former head of the K-9 unit, has been an active member of New London police officers' AFSCME Local 724, becoming vice president of the union in March 2011, and president in November 2011. (Am. Compl. [Doc. # 28] ¶¶ 1, 4, 34, 41.) Chief Ackley became the New London Chief of Police in June 2009. Officer Lynch and Chief Ackley's relationship was strained by New London politics and, it seems, personal antipathy. In particular, Officer Lynch associated with two individuals—William Dittman and Michael Buscetto—with whom Chief Ackley had serious disagreements. (*Id.* ¶¶ 9–10, 12.) When Chief Ackley rose to her position as chief

of police, she beat out William Dittman, with whom Officer Lynch associated and against whom Chief Ackley had made hostile-workplace accusations based on Officer Dittman's allegedly sexist actions. (*Id.* ¶¶ 7, 10.) Michael Buscetto was a City Councilman and mayoral candidate, chaired the Public Safety Committee, and had a history of turf wars with Chief Ackley (*Id.* ¶¶ 5, 14–15.) In December 2009, Councilman Buscetto opposed Chief Ackley's proposal that a non-union deputy chief of police handle civilian complaints and disagreed with Chief Ackley about other procedures for civilian complaints in the Police Community Relations Committee ("PCRC"). (*Id.* ¶¶ 14–15.)

In early 2010, Chief Ackley took "disciplinary and adverse employment" actions against Officer Lynch, because she perceived that he was part of the "good old boy" network with Councilman Buscetto and Officer Dittman. (*Id.* ¶ 16.) In particular, in January 2010, Chief Ackley barred Officer Lynch from performing a public demonstration with Jasper, his K-9 unit dog, at the annual "Bash at the Beach" fundraiser, suspended Jasper in response to an undisclosed incident that occurred while Officer Lynch (and Jasper) were off duty, and refused to accept a cash donation intended for the K-9 unit. (*Id.*)

On August 18, 2010, Officer Lynch requested that the union file a grievance against Chief Ackley, claiming that she had attended a July 29, 2010 union meeting about the police department's "flex time" policy, in order to deter union members from openly discussing their views on flex time. (*Id.* ¶ 17–18.) On September 2, 2010, Chief Ackley removed K-9 compensation hours, directed that Officer Lynch would no longer get reimbursed for foregoing the City's insurance plan, and refused Officer Lynch's request for leave to attend his classmate's funeral. (*Id.* ¶ 19.)

On September 20, 2010, Officer Lynch suggested that the union consider a no-confidence vote against Chief Ackley. (*Id.* ¶ 20.) Nine days later, Chief Ackley refused to permit Officer Lynch to attend a K-9 conference that he had attended in the past (*id.* ¶ 21), and on October 7, 2010 she removed Officer Lynch's "Fourth Squad Shift," which he had requested (*id.* ¶ 22).

On October 24, 2010, Officer Lynch requested that the police department invest in "door poppers" for the K-9 cars, noting that without popper technology, the dog, rather than the trainer, would decide when it would deploy. (*Id.* ¶ 23.) On November 16, 2010, Officer Lynch's dog "deployed of its own accord," biting a young girl. (*Id.* ¶ 24.)  Even though Officer Lynch was cleared of any wrongdoing, the dog-bite incident "fuel[ed] the animus" against Officer Lynch. (*Id.* ¶¶ 26-27.)  In December 2010, Officer Lynch began voluntarily attending the PCRC meetings, openly opposing Chief Ackley's proposal to have civilian complaints read openly to the public. (*Id.* ¶¶ 30-31.)

The Lynch-Ackley relationship continued to sour with the approach of the New London mayoral election. In January 2011, Councilman Buscetto announced his mayoral candidacy, and in June 2011 the union—with Officer Lynch now serving as vice president—endorsed Councilman Buscetto (*Id.* ¶¶ 32, 34.) On January 5, 2011, Chief Ackley met with then-candidate and now-mayor Daryl Finizio to discuss the role of the chief of police. (*Id.* ¶ 33.)  In May 2011, Chief Ackley limited Officer Lynch's responsibilities with the K-9 unit in various respects (*id.* ¶ 35.), and, later in 2011, she engaged in correspondence with Kathleen Mitchell—a local reporter for *The Patch* and *The Day*, mayoral candidate, and "known political gadfly"—for the "purposes of causing damage to Plaintiff's reputation." (*Id.* ¶¶ 6, 35–36.)

3

Chief Ackley sent at least seven e-mails to Ms. Mitchell, from July through September 2011. (*Id.* ¶ 35.b.) In these e-mails, which are appended to the Amended Complaint, Chief Ackley, *inter alia*, characterizes Officer Lynch as in cahoots with Councilman Buscetto and suggests that Ms. Mitchell submit specific Freedom of Information ("FOI") requests regarding Officer Lynch. (*See id.*) For example, Chief Ackley wrote on July 28, 2011,

> You're right and if people don't realize that most of the negative blogs are the result of Mike [Buscetto] and those that he owns then they must be blind. Citizens of [New London] have no idea the threats Mike has sent to me and the non stop attempts to try and hurt me. He will not have control of law enforcement as long as I'm chief, I will not turn my head and allow he and his "lynch" squad to show favor to the chosen few all at the expense of those he considers less then himself.

(Ex. A to *id.*) On August 11, 2011, she e-mailed that

> [t]he threat of a no confidence vote is the unions [sic] way of taking control of the police department, and we know how well that worked over the years, Council is either going to stand up to the police union/Buscetto union and let it be known that they are not going to permit the constant threats as a means to take control . . . . That will take away some of Buscetto power and put union vice president Lynch in his place, but who knows what the entire council will do.
>      . . . Dittman, Lynch, Lacey and Buscetto are all very close as you already know. Lynch had some issues in E. Lyme and Ledyard when he was the resident trooper there, so they transferred him to training K-9, then somehow with that background, New London hired him. FOI all "citizen complaints" and "lawsuits" that Lynch is named in, that will tell everyone what he was all about till I put him in check. . . .

(Ex. B to *id.*) About a week later, on August 19, 2011, Chief Ackley that it was "[t]ime to throw another bomb, maybe you should send an FOI request to VIEW all law suits concerning police K-9's as well as all Civilian Complaints concerning Todd Lynch." (Ex. C to *id.*)

Concurrent with Chief Ackley's e-mail correspondence with Ms. Mitchell, on August 18, 2011, Chief Ackley issued a statement before the City Council alleging that Councilman Buscetto had undermined her authority at the police department and orchestrated a hostile work environment. (*Id.* ¶ 38; *id.* Ex. G to *id.*)  Officer Lynch then penned an open letter to the citizens of New London in September 2011 that appeared in *The Day*, accusing Chief Ackley of ineffective leadership. (*Id.* ¶¶ 39–40; Ex. H to *id.*) Thereafter, Chief Lynch started denying union business days off to Officer Lynch—who rose to union president on November 10, 2011—and scheduled grievances on his days off to make him use his personal time for union business. (*Id.* ¶¶ 41–42.)

On February 10, 2012, Officer Lynch called for an inquiry into whether Chief Ackley violated a city ordinance by improperly investigating an individual's immigration status, and asked that she be placed on administrative leave. (*Id.* ¶ 43.) Later that day, Chief Ackley instituted a policy requiring a sergeant to be present to monitor any K-9 training, and in April 2012 when Mayor Finizio requested information from her regarding the cost of the K-9 unit, Chief Ackley provided inflated calculations of the cost and suggested that the unit engaged in racial profiling.  (*Id.* ¶¶ 44–46.)

II.   **Discussion**[1]

    A.   **First Amendment Claims**

Plaintiff brings Count Two against Chief Ackley under § 1983, alleging that Chief Ackley violated the First Amendment by retaliating against him for his exercising both his free speech and association rights. (*See* Am. Compl. ¶ 49.) In Count Three, Plaintiff brings a *Monell* claim against the City. *See generally Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658 (1978).  As Defendants do not independently challenge the imposition of *Monell* liability,[2] both Counts Two and Three turn on whether Plaintiff has a viable § 1983 claim against Chief Ackley.

To prevail on his First Amendment retaliation claim, Officer Lynch "must establish that: (1) his speech or conduct was protected by the First Amendment; (2) the defendant took an adverse action against him; and (3) there was a causal connection between this adverse action and the protected speech." *Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 272 (2d Cir. 2011).  Officer Lynch asserts two separate grounds for his

---

[1] "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although detailed allegations are not required, a claim will be found facially plausible only if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Conclusory allegations will not suffice. *Id.* at 678–79; *see also* Fed. R. Civ. P. 12(b)(6).

[2] Counsel for Defendants acknowledged at oral argument that they do not independently challenge the applicability of *Monell*, and that the fate of Count Three thus depends on the viability of Count Two.  If Count Two survives Defendants' motion to dismiss, so too does Count Three.

First Amendment claim—one based on his speech, the other on his association with Councilman Buscetto and the union.

1. *Speech Claim*

Not all of a government employee's speech receives constitutional protection. To receive First Amendment protection an employee must speak "as a citizen on a matter of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). As noted by the Second Circuit, this requirement encompasses two distinct questions: "(1) whether the subject of the employee's speech was a matter of public concern and (2) whether the employee spoke 'as a citizen' rather than solely as an employee." *Jackler v. Byrne*, 658 F.3d 225, 236 (2d Cir. 2011) (quoting *Garcetti*, 547 U.S. at 420–22, 424). Defendants do not contend that Officer Lynch's speech is not of public concern; rather, they argue that some of the speech alleged in the Amended Complaint was spoken as an employee and not as a citizen. "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421; *see also Jackler*, 658 F.3d at 237. A public employee speaks "pursuant to" his duties—and is therefore without First Amendment protection—when his or her conduct is "part-and-parcel of his concerns about his ability to properly execute his duties." *Weintraub v. Bd. of Educ.*, 593 F.3d 196, 203 (2d Cir. 2010). The Second Circuit offers the following "rule of thumb" for distinguishing citizen-speech from employee-speech: "activities required of the employee as part of his employment duties are not performed 'as a citizen' if they are not the kind of activity engaged in by citizens who do not work for the government." *Jackler*, 658 F.3d at 237. That is, a court should ask

7

whether there is a "relevant citizen analogue," *id.* at 238 (quoting *Weintraub*, 593 F.3d at 198), and if there is no such analogue, then the employee's speech is unlikely to have been spoken "as a citizen."

Some of the speech alleged in Officer Lynch's Amended Complaint is not entitled to protection. Councilman Buscetto's disagreements with Chief Ackley are not protected in the instant suit (*see* Am. Compl. ¶¶ 14–15), because Officer Lynch was not the speaker and cannot assert Councilman Buscetto's rights for him.[3] Counsel for Plaintiff confirmed at oral argument that the allegations regarding Councilman Buscetto's speech were included in the Amended Complaint not as instances of protected speech, but rather for evidentiary purposes regarding Plaintiff's associational claim. In addition, Officer Lynch's request for door poppers is plainly barred by *Garcetti*, because his request—made via intra-office memorandum and in furtherance of his duties with the K-9 unit (*see id.* ¶ 23)—was "part-and-parcel of his concerns about his ability to properly execute his duties." *Weintraub*, 593 F.3d at 203.

Defendants argue that Officer Lynch spoke as an employee when he called for an investigation of Chief Ackley on February 10, 2012 (*see* Am. Compl. ¶ 43), because Officer Lynch's duties as a police officer include rooting out all instances of illegal conduct. (*See* Defs.' Mem. [Doc. # 34] at 11.) By asking that Chief Ackley be investigated for violating an ordinance, Defendants contend, Officer Lynch was simply doing his job—and therefore speaking as an employee rather than as a citizen. This argument

---

[3] The allegations regarding Councilman Buscetto's disagreement with Chief Ackley may be relevant to Plaintiff's associational First Amendment claim, discussed below.

cannot be squared with *Matthews v. City of New York*, 12-1622-cv, 2012 WL 5935359, at *1 (2d Cir. Nov. 28, 2012) (summary order).  In *Matthews*, a police officer alleged that he was retaliated against after telling his commanding officers that a quota system existed in the police department, in violation of New York law.  *See id.*  Vacating the district court's Rule 12(b)(6) dismissal of the officer's First Amendment retaliation claim, the Second Circuit rejected the notion that a police officer's duties necessarily extend to eliminating any and all unlawful behavior, noting that discovery was needed regarding the "nature of the plaintiff's job responsibilities, the nature of the speech, and the relationship between the two." *Id.* (quoting *Ross v. Breslin*, 693 F.3d 300, 306 (2d Cir. 2012)).

Similarly, the Court is unable at this stage to determine as a matter of law that the August 18, 2010 request for a grievance was unprotected employee-speech.  Counsel for Plaintiff acknowledged at oral argument that, in requesting the grievance, Officer Lynch may not have been speaking as a citizen for First Amendment purposes.  *See Weintraub*, 593 F.3d at 203–04 (holding that a teacher's union grievance challenging a school administrator's decision not to discipline a student was not First Amendment–protected speech, because the teacher's complaint was a "means to fulfill . . . his primary employment responsibility of teaching," and because the teacher's speech "took the form of an employee grievance, for which there is no relevant citizen analogue").[4]  However, the Court cannot here conclude that Officer Lynch did not speak as a citizen when he

---

[4] The Court further observes that Officer Lynch's request that the union file a grievance may not address a matter of public concern. "Whether or not speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record . . . ." *Sousa v. Roque*, 578 F.3d 164, 175 (2d Cir. 2009) (internal citation and quotation marks omitted).  Resolving this public-concern question would be premature at this stage.

requested that a grievance be filed. *See Ross*, 693 F.3d at 306 (noting that the "inquiry into whether a public employee is speaking pursuant to her official duties is not susceptible to a brightline rule" but rather turns on "contextual factors"). Simply put, while the August 2010 grievance and the February 2012 request for an investigation may both prove to be unprotected speech at summary judgment, the Court cannot reach this conclusion on the pending motion to dismiss.

In sum, drawing reasonable inferences in Officer Lynch's favor, he has alleged six instances of protected speech: (1) his August 2010 request for a grievance; (2) his request in September 2010 that the union consider a vote of no confidence in Chief Ackley; (3) his opposition at PCRC meetings to Chief Ackley's proposal to have civilian complaints read openly to the public; (4) his involvement as vice president of the union in its June 2011 mayoral endorsement of Councilman Buscetto; (5) his September 2011 open letter in the local newspaper; and (6) his request that Chief Ackley be investigated and placed on administrative leave.

Having identified the universe of protected speech, the Court now turns to remaining two elements of Officer Lynch's retaliation claim: whether Chief Ackley "took an adverse action against him" and whether "there was a causal connection between this adverse action and the protected speech." *Cox*, 654 F.3d at 272. "Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action." *Dawes v. Walker*, 239 F.3d 489, 493 (2d Cir. 2001); *see also Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 226 (2d Cir. 2006). Adverse actions include "discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand," as well as "lesser actions" such as negative evaluation

letters or express accusations of lying. *Zelnik*, 464 F.3d at 226 (internal quotations omitted). The Second Circuit has made clear that "whether an undesirable employment action qualifies as being 'adverse' is a heavily fact-specific, contextual determination." *Id.* (quoting *Hoyt v. Andreucci*, 433 F.3d 320, 328 (2d Cir. 2006). While it is doubtful whether some of alleged retaliatory acts are sufficiently serious to qualify as "adverse actions"—e.g., Chief Ackley refusing to accept a cash donation intended for the K-9 unit (*see* Am. Compl. ¶ 16.c)—Chief Ackley's command that Officer Lynch no longer be reimbursed for foregoing the City's health insurance plan (*see id.* ¶ 19.b) qualifies as an adverse action, since this action was tantamount to a reduction in pay.[5]

Defendants argue that there is no causal connection between the First Amendment–protected activity and the retaliatory conduct. (*See* Defs.' Mem. at 13–14.) "The ultimate question of retaliation involves a defendant's motive and intent, both difficult to plead with specificity in a complaint. It is sufficient to allege facts from which a retaliatory intent on the part of the defendants reasonably may be inferred." *Dougherty v. Town of N. Hempstead Bd. of Zoning*, 282 F.3d 83, 91 (2d Cir. 2002). The Court can reasonably infer a causal nexus from the temporal proximity of Officer Lynch's August 2010 grievance request and Chief Ackley's September 2010 decision to discontinue the insurance-related payments to Officer Lynch.

---

[5] It is noteworthy that the only remaining allegation of protected speech that predates Chief Ackley's decision to stop the payments in lieu of insurance is Officer Lynch's request on August 18, 2010 that the union file a grievance against Chief Ackley. If at a later stage in this case, the record indicates that this grievance request was not protected speech, Plaintiff will have to establish that another of Chief Ackley's acts constitutes an "adverse action." Needless to say, retaliatory actions—absent clairvoyance—must be taken after the constitutionally protected conduct.

### 2.     Associational Claim

Officer Lynch also alleges that Chief Ackley's retaliatory conduct violated his right to freedom of association.  To establish his First Amendment retaliation claim based on associational conduct, Officer Lynch must demonstrate that: (1) his associational conduct was constitutionally protected; (2) Chief Ackley took an adverse action against him; and (3) there was a causal connection between the adverse action and the protected conduct. *See Cox*, 654 F.3d at 272; *see also Cobb v. Pozzi*, 363 F.3d 89, 107–08 (2d Cir. 2004) (analyzing all three prongs to evaluate the validity of a freedom-of-association claim). Indeed, as with a speech-retaliation claim, "a public employee bringing a First Amendment freedom of association claim must persuade a court that the associational conduct at issue touches on a matter of public concern." *Cobb*, 363 F.3d at102.

The Constitution has been held to protect two distinct types of association, intimate association and expressive association. *See Roberts v. United States Jaycees*, 468 U.S. 609, 617–18 (1984).  However, "[t]he Constitution does not recognize a generalized right of social association." *Sanitation and Recycling Indus., Inc., v. City of New York*, 107 F.3d 985, 996 (2d Cir. 1997). Officer Lynch's Amended Complaint does not describe any sort of "intimate association" that would entitle him to constitutional protection, *see Roberts*, 468 U.S. at 619–20 (describing intimate associations such as marriage and family relationships), so the question is whether, drawing reasonable inferences in his favor, Officer Lynch's Amended Complaint alleges an "expressive association" in the form of either a political association with Councilman Buscetto or union membership. *Compare Wrobel v. Cnty. of Erie*, 211 F. App'x 71, 72 (2d Cir. 2007) (vacating district court's Rule

12

12(b)(6) dismissal, concluding that the complaint "sufficiently alleges that [the plaintiff] was retaliated against for his lack of political affiliation with, or his refusal to pledge his allegiance to, the new . . . County administration"), *with Catalano v. Lehman*, No. 04-CV-389, 2007 WL 5520661, at *5 & n.6 (W.D.N.Y. Sept. 27, 2007) (recommending dismissal of the plaintiff's freedom of association retaliation claim, noting that the "facts alleged . . . do not raise plaintiff's political affiliation as the motive for the defendants' alleged retaliatory conduct," but rather "the associational conduct identified in the complaint is simply plaintiff's friendship"). The Court can reasonably infer from the Amended Complaint that Officer Lynch maintained an "expressive association" touching on a matter of public concern. The Amended Complaint together with the appended exhibits indicate not only that Mr. Buscetto was a mayoral candidate and city councilman, but that Chief Ackley understood that Officer Lynch, Councilman Buscetto, and the police union were working in concert. (*See, e.g.*, Ex. B to Am. Compl. (referring to the "police union/Buscetto union").)  In addition, Plaintiff's leadership role with the union is plainly evident from his Amended Complaint. (*See* Am. Compl. ¶¶ 34, 41.)The Court can thus infer from the pleadings two distinct, though perhaps overlapping, associations that are protected by the First Amendment: Officer Lynch's union activities and his political association with Councilman Buscetto.

The Court can also reasonably infer that Chief Ackley took an adverse action against Officer Lynch and that there was a causal connection between this action and Officer Lynch's protected association. As discussed above, denying Officer Lynch

insurance-related reimbursements constitutes an adverse action.[6] As for a causal nexus, between Chief Ackley's action and the protected associational conduct, the Court can deduce that Chief Ackley acted with a retaliatory intent when she discontinued his insurance-related payments, based on the fact that Chief Ackley recognized Officer Lynch's role in the union (*see* Ex. F to Am. Compl.) and viewed him as an adversary (*see* Ex. C to *id.* ("Time to throw another bomb, maybe you should send a FOI request to [view] . . . all Civilian Complaints concerning Todd Lynch.")). Even assuming that Chief Ackley's e-mails to Ms. Mitchell do not themselves constitute First Amendment retaliation, they nevertheless allow the Court to conclude that other actions were taken with the same intent.

### 3. *Qualified Immunity*

Chief Ackley also seeks dismissal of the § 1983 claim on qualified-immunity grounds.  Qualified immunity shields officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A right is "clearly established" when "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what [she] is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  "'This is not to say that an official

---

[6] Of course, Chief Ackley's decision to discontinue the payments to Officer Lynch can only constitute retaliation if the constitutionally protected associational conduct predates the termination of payments. Drawing inferences in Officer Lynch's favor, the Court can here conclude that his political association with Councilman Buscetto began before September 2, 2010. (*See* Am. Compl. ¶ 19.) However, if after discovery, it becomes clear that the temporal scope of Officer Lynch's protected associations is narrower and does not predate the discontinuation of payments, then Plaintiff will have to convince the Court that different actions taken by Chief Ackley also constitute "adverse actions."

action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.'" *Wilson v. Layne*, 526 U.S. 603, 615 (1999) (quoting *Creighton*, 483 U.S. at 640). Chief Ackley's qualified immunity defense "faces a formidable hurdle" at the Rule 12(b)(6) stage because "the plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense." *McKenna v. Wright*, 386 F.3d 432, 434, 436 (2d Cir. 2004) (internal quotation marks omitted).

> The Second Circuit has observed that
>
> in January 2006. . . it had been clearly established that the First Amendment protected a citizen's decision both as to what to say and what not to say, and that it protected a government employee, including a police officer, speaking as a citizen on a matter of public concern, against retaliation for that speech except where the government's interest in the agency's proper functioning outweighed the employee's First Amendment right.

*Jackler*, 658 F.3d at 243. While Chief Ackley may develop a summary judgment record showing that it was objectively reasonable to believe that the interest in the police department's proper functioning outweighed Officer Lynch's First Amendment rights, the Court is constrained at the motion to dismiss stage to draw inferences in favor of Officer Lynch from the allegations of the complaint and thus is unable to conclude that the police department's proper functioning required Chief Ackley to treat Officer Lynch as she did.

Defendants contend that the law regarding what constituted adverse employment actions was sufficiently unclear such that Chief Ackley is entitled to qualified immunity. The Second Circuit made clear, however, that adverse actions include "discharge, refusal

to hire, refusal to promote, demotion, reduction in pay, and reprimand," as well as "lesser actions" such as negative evaluation letters or express accusations of lying. *Zelnik*, 464 F.3d at 226. Chief Ackley's decision to deny Officer Lynch reimbursement for foregoing the City's insurance plan was tantamount to a reduction in pay, falling clearly within the scope of adverse actions as defined by the Second Circuit. Qualified immunity is therefore unavailable to Chief Ackley at this stage.

    **B.**    **Section 31-51q**

Section 31-51q provides that:

> Any employer, including the state and any instrumentality or political subdivision thereof, who subjects any employee to discipline or discharge on account of the exercise by such employee of rights guaranteed by the first amendment to the United States Constitution or section 3, 4 or 14 of article first of the Constitution of the state, provided such activity does not substantially or materially interfere with the employee's bona fide job performance or the working relationship between the employee and the employer, shall be liable to such employee for damages caused by such discipline or discharge . . . .

Conn. Gen. Stat. § 31-51q. To make out a prima facie § 31-51q claim against the City, Plaintiff Lynch "must show that (1) the speech at issue was made as a citizen on matters of public concern rather than as an employee on matters of personal interest; (2) he suffered an adverse employment action; and (3) the speech was at least a substantial or motivating factor in the adverse employment action." *Konspore v. Friends of Animals, Inc.*, No. 3:10cv613 (MRK), 2012 WL 965527, at *16 (D. Conn. Mar. 20, 2012).

    As Officer Lynch has a viable First Amendment claim, *see supra* Part II.A, he appears to satisfy the requirements under § 31-51q. Defendants argue, however, that the scope of what constitutes an adverse action for § 31-51q purposes is narrower than for a § 1983 purposes. Section 31-51q speaks in terms of "discharge or discipline," and

16

Defendants advocate for a narrow interpretation of this language that excludes Chief Ackley's allegedly retaliatory actions. As Officer Lynch was never fired, the relevant question is whether Officer Lynch's allegations rise to the level of "discipline" within the meaning of § 31-51q.  This question is not easily answered, as the term has no statutory definition and no Connecticut appellate court decision has construed the term. *See Kahn v. Conn. Dep't of Mental Health & Addiction Servs.*, No. FSTCV095010654, 2011 WL 3278534, at *7 (Conn. Super. Ct. July 7, 2011).  Drawing on *Bombalicki v. Pastore*, a Connecticut Superior Court case, the Second Circuit observed that "discipline" under § 31-51q "involves affirmative acts of punishment that (at least while the punishment is being inflicted) leave the recipients in a less happy state than that which they enjoyed before the punishment began." *Avedisian v. Quinnipiac Univ.*, 387 F. App'x 59, 61 (2d Cir. 2010) (quoting *Bombalicki v. Pastore*, No. 378772, 2000 WL 726839, at *1 (Conn. Super. Ct. May 10, 2000)).  Other Connecticut Superior Court decisions have applied a broader standard for what constitutes discipline, noting that

> adverse employment actions may include demotion, suspension, reduction in pay, reprimand, significantly diminished responsibilities but may also include lesser affirmative acts of punishment or deprivation taken by the employer which leave an employee less well off and which in combination and in their totality, create a working environment that is unreasonably inferior, hostile or adverse to the employee when compared to atypical or normal, not ideal or model, workplace. Incidents that are relatively minor and infrequent such as a change of working conditions that is a mere inconvenience or simply alters an employee's job responsibilities, personality conflicts at work that generate antipathy and snubbing by supervisors and co-workers will not meet this standard.

*Charron v. Town of Griswold*, No. KNLCV065000849S, 2009 WL 5511272, at *11 (Conn. Super. Ct. Dec. 14, 2009). Under either version of the standard, however, the Court

concludes that Plaintiff was subject to "discipline." Chief Ackley's determination that Plaintiff be denied reimbursement for foregoing the City's health insurance (*see* Am. Compl. ¶ 19.b) was a "reduction in pay," *see Charron*, 2009 WL 5511272 at *11, as well an affirmative act leaving the Officer Lynch in a less happy state than before the punishment began, *see Avedisian*, 387 F. App'x at 61.

### C. Libel Claims

To establish a prima facie case of defamation, Officer Lynch "must demonstrate that: (1) the defendant published a defamatory statement; (2) the defamatory statement identified the plaintiff to a third person; (3) the defamatory statement was published to a third person; and (4) the plaintiff's reputation suffered injury as a result of the statement." *Cweklinsky v. Mobil Chem. Co.*, 267 Conn. 210, 217 (2004). A public figure suing for defamation faces an additional requirement that he must prove that the false statement was made with "actual malice." *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964); *see also Holbrook v. Casazza*, 204 Conn. 336, 342 (1987). Actual malice can be demonstrated by showing the defendant made the statement with knowledge the statement was false or with reckless disregard for whether it was false or not. *Holbrook*, 204 Conn. 336, 342 (1987).

Plaintiff is a public figure. *See Martin v. Griffin*, No. CV-99-0586133S, 2000 WL 872464, at *8 (Conn. Super. Ct. June 13, 2000) ("[A] former police officer and head of the police union . . . must be considered both a 'public official' and a 'public figure . . . .'"); *Holmes v. Town of E. Lyme*, 866 F. Supp. 2d 108, 130 (D.Conn. 2012) (plaintiff–police officer conceded he was a public figure for defamation purposes). Plaintiff is therefore required to plead and eventually prove malice. Notwithstanding Defendants' arguments

to the contrary, Plaintiff has adequately pled all of the required elements for his libel claims in Counts Four through Seven.

### III.    Conclusion

For the reasons described above, Defendants' Motion to Dismiss [Doc. # 33] is **DENIED**.

IT IS SO ORDERED.

___/s/_____
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 13th day of December, 2012.