## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| TODD LYNCH,<br><br>  Plaintiff,<br><br>  v.<br><br>MARGARET ACKLEY and<br>CITY OF NEW LONDON,<br><br>  Defendants. | No. 3:12-CV-537 (MPS) |

## MEMORANDUM OF DECISION

### I.    Introduction

Plaintiff Todd Lynch ("Lynch") brings his Second Amended Complaint alleging violations of his rights under the First and Fourteenth Amendments to the Constitution against Defendants Margaret Ackley ("Defendant Ackley") and the City of New London ("Defendant City") (collectively the "Defendants"), a violation of Connecticut General Statute section 31-51q against Defendant City, and four counts of defamation against Defendant Ackley.[1]  Defendants have separately moved for summary judgment as to all the claims.

### II.    Background

I assume the parties' familiarity with the voluminous factual record and I include only a brief recitation of the key facts.

In her December 2012 ruling on Defendants' first Motion to Dismiss, Judge Arterton limited Lynch's allegations of potentially protected speech to the following:  (1) Lynch's August 2010 request for a grievance; (2) his September 2010 request that the union consider a vote of no

---

[1] I dismissed Lynch's claim of intentional infliction of emotional distress in my December 19, 2013 Motion to Dismiss ruling.  (*See* ECF No. 90, at 4-6.)

confidence in Chief Ackley; (3) his opposition at Police Community Relations Committee ("PCRC") meetings to Chief Ackley's proposal to have civilian complaints disclosed to the public; (4) his involvement as Vice President of the police union in the union's June 2011 mayoral endorsement of Councilman Buscetto; (5) his involvement in the union's September 2011 open letter in a local newspaper ad; and (6) his request on behalf of the union that Chief Ackley be investigated and placed on administrative leave.  *Lynch v. Ackley*, No. 3:12cv537, 2012 WL 6553649, at *5 (D. Conn. Dec. 14, 2012).

Lynch then filed his Second Amended Complaint, which included the following additional allegations of speech:  (1) the New London City Council Public Safety Committee ("PSC") invited Lynch to attend its October 22, 2012 meeting and Lynch attended in his capacity as union president and as a police officer to offer opinion and information regarding the low morale in the Department and the high rate of turnover among police officers, (Sec. Am. Comp. ¶¶ 55, 58); (2) in May 2013, Lynch testified at a PSC meeting that certain information about police officers should not be disclosed to the public (Sec. Am. Comp. ¶ 62); and (3) on July 1, 2013, Lynch attended a PSC meeting "along with numerous citizens" to discuss his opposition to retiring certain dogs in the Canine Unit.  (Sec. Am. Comp. ¶ 73.)

Lynch's Second Amended Complaint also includes allegations that his speech during June 2013 union negotiations are protected.  (Sec. Am. Comp. ¶¶ 69-71.)  Although Defendant Ackley's Motion for Summary Judgment raises arguments regarding why this speech is unprotected, (*see* Def. Ackley's MSJ, at 11), Lynch does not address them.[2]  I therefore consider Lynch's arguments regarding his speech at the June 2013 union meeting waived.  *See Taylor v. City of New York*, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003).

---

[2] Lynch mentions these negotiations only when arguing that his placement on AWOL status after the negotiations was an adverse employment action; in his summary judgment briefing, he does not argue the negotiations were protected speech.  (Lynch's Response, at 31.)

## III.    Legal Review

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quotation marks omitted).  The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986), and the Court must resolve all ambiguities and draw all inferences in favor of the nonmoving party.  *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008).  If the moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact."  *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011).

## IV.    Discussion

### A.  Lynch's First Amendment Speech Claims

Lynch brings his First Amendment retaliation claim against Defendants under 42 U.S.C. § 1983.[3]  It is well settled that "a public employee does not relinquish First Amendment rights to comment on matters of public interest by virtue of government employment."  *Connick v. Myers*, 461 U.S. 138, 140 (1983).  These rights, however, must be balanced against "the interest of the

---

[3] 42 U.S.C. § 1983 states:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . . subjects . . . any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1986).

To prove that a government employee has violated his First Amendment rights, the employee must first show that he spoke as a citizen on a matter of public concern. *Connick*, 461 U.S. at 140. This showing consists of two parts: (1) the employee spoke as a citizen, and (2) the employee spoke on a matter of public concern. *Garcetti v. Ceballos*, 547 U.S. 410, 420-22 (2006). To prove a violation, the employee must next show that "he suffered an adverse employment action, and a causal connection existed between the speech and the adverse employment action, so that it can be said that his speech was a motivating factor in the determination." *Cobb v. Pozzi*, 363 F.3d 89, 102 (2d Cir. 2004) (citing reference omitted). Even if an employee satisfies these factors, the government may still avoid liability by either "(1) demonstrat[ing] by a preponderance of the evidence that it would have taken the same adverse action regardless of the protected speech [or conduct], or (2) show[ing] that the plaintiff's expression was likely to disrupt the government's activities, and that the likely disruption was sufficient to outweigh the value of the plaintiff's First Amendment expression." *Id.*

### 1. Speech as a Citizen on a Matter of Public Concern

The parties dispute whether Lynch spoke as a citizen on a matter of public concern. For purposes of this ruling, I will evaluate the allegations of "speech" that Judge Arterton recognized in her motion to dismiss ruling and the new factual allegations Lynch raised in his Second Amended Complaint, because neither party has suggested that Judge Arterton's analysis was incorrect or that any additional instances of speech should be considered. Lynch argues that much of his speech is protected because it was voiced through his union activity. Defendants argue that Lynch's union activities are not protected speech under *Garcetti* because they were

part of his job duties, either with the Canine Unit or in general as a police officer. Defendants also argue that Lynch's union activities do not address a "matter of public concern" because the impetus for the union's actions were Lynch's personal grievances with Defendant Ackley that related to Lynch and his employment.

In *Garcetti*, the Supreme Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421. *Garcetti* considered whether a deputy district attorney's memo to his supervisors in the district attorney's office, which alleged that there were inaccuracies in an affidavit used to obtain a search warrant, was protected by the First Amendment. *Id.* at 420. The Court found that the memo "addressed the proper disposition of a pending criminal case," *id.* at 422, and thus was "part of what [the deputy district attorney] . . . was employed to do." *Id.* at 421. In writing the memo, the deputy district attorney "spoke as a prosecutor fulfilling a responsibility to advise his supervisor about how best to proceed with a pending case." *Id.* As a result, the Court held that the deputy district attorney's speech was made "pursuant to" his official duties and was not protected by the First Amendment. *Id.*

In *Garcetti*, the Court made clear that it was not setting forth "a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate." *Id.* at 424. In a more recent decision, *Lane v. Franks*, the Supreme Court cautioned against reading *Garcetti* too broadly. *Lane v. Franks*, 134 S. Ct. 2369, 2379 (2014). In *Lane*, the Court found that the Eleventh Circuit applied *Garcetti* too expansively when it held that a community college's program director's sworn testimony at a former employee's corruption trials was not citizen speech because the director learned of the subject matter of his

testimony in the course of his employment.  *Id*.  In rejecting the Eleventh Circuit's conclusion, the Court stated:

> In other words, the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech. The critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties.

*Id*.  The Second Circuit has provided further guidance on *Garcetti*'s reach.  In *Weintraub*, the Second Circuit held that a public employee speaks "pursuant to" his duties when the employee's conduct is "part-and-parcel of his concerns about his ability to properly execute his duties." *Weintraub v. Bd. of Educ.*, 593 F.3d 196, 203 (2d Cir. 2010).  The Second Circuit has provided the following "rule of thumb" for distinguishing citizen-speech from employee-speech: "activities required of the employee as part of his employment duties are not performed 'as a citizen' if they are not 'the kind of activity engaged in by citizens who do not work for the government.'" *Jackler v. Byrne*, 658 F.3d 225, 237 (2d Cir. 2011) (citing *Garcetti*, 547 U.S. at 423).  A court should ask whether there is a "relevant citizen analogue," and if there is not, then the employee's speech is unlikely to have been spoken as a citizen.  *Id*. at 238.

Whether an employee's speech addresses a matter of public concern is a question of law, and should be "determined by the content, form and context of a given statement, as revealed by the whole record."  *Connick*, 461 U.S. at 147-48.  In general, speech on "any matter of political, social, or other concern to the community" is protected.  *Id*. at 146.  Whether an employee's speech "concerned the subject matter of [the speaker's] employment [is] . . . nondispositive." *Garcetti*, 547 U.S. at 421.  In addition, the employee's "motive is not dispositive in determining whether his or her speech addresses a matter of public concern."  *Sousa v. Roque*, 578 F.3d 164, 173 (2d Cir. 2009).  Instead, "the primary question for First Amendment purposes is whether the

6

matter is of public concern, not whether the speech was also made to serve some private interest." *Nagle v. Marron*, 663 F.3d 100, 107 (2d Cir. 2011). "Speech that, although touching on a topic of general importance, primarily concerns an issue that is 'personal in nature and generally related to [the speaker's] own situation,' such as his or her assignments, promotion, or salary, does not address matters of public concern." *Jackler*, 658 F.3d at 236 (citing reference omitted).

Lynch's allegations of "protected speech" can be broken into two categories: those in which he alleges that he spoke as a union representative and those in which he does not. As for the union-related speech, the parties do not dispute that Lynch was actively involved with the union, but do dispute whether Lynch's speech pursuant to his union activities was made as a citizen or as an employee. Evaluating this dispute requires a close analysis of each instance of union-related speech. All facts stated below are undisputed, unless otherwise noted.

**a. August 2010 Grievance**

In July 2010, a union meeting was convened by then-union President Darrin O'Mara to discuss the police department's flex-time policy; Lynch attended. (*See* Lynch's Response, Ex. 4, 10068-69.) While the parties do not agree whether Defendant Ackley was invited, Defendant Ackley attended the meeting, which led to Lynch's filing of a grievance in August 2010 through the union alleging that Defendant Ackley's uninvited presence was intended to chill and deter union members from speaking openly about the flex-time policy. (*See* Lynch's Response, Ex. 4, at 10067.)

Defendants argue Lynch's grievance is barred under *Weintraub*. In *Weintraub*, the Second Circuit affirmed summary judgment against a public school teacher's First Amendment retaliation claim in which he alleged that he had been terminated after filing a formal grievance

through his union.  *Weintraub*, 593 F.3d at 200.  The court held that the teacher's grievance, which related to his supervisor's failure to discipline a child who had thrown a book at the teacher, was made pursuant to his official duties under *Garcetti*, because the speech was "part-and-parcel" of the teacher's concerns about maintaining discipline in his classroom.  *Id*. at 203. The court also relied on the fact that the teacher's speech "ultimately took the form of an employee grievance, for which there is no relevant citizen analogue."  *Id.* at 204.

Defendants' reliance on *Weintraub* is misplaced.  Although Lynch did file his grievance through his union, he did so on behalf of himself and other union members, not as part of his duties as a police officer.  Lynch's grievance made clear that he was speaking on behalf of all union attendees at the meeting, repeatedly referring to "their" concerns and seeking relief on the union's behalf.  (*See* Lynch's Ex. 4, at 10067.)  Further, unlike the grievance filed by the teacher in *Weintraub*, Lynch's grievance was not aimed at redressing his own workplace grievances or any matter related to his job duties.  Rather, it sought to enforce the union's rights to meet and deliberate outside the presence of management, and raised the chilling effect Defendant Ackley's presence had on the *union*.  His activities were thus not just unrelated to the duties he performed for his employer but *adverse* to the interests of his employer.  Other courts have similarly found that because of the adverse interests between a union and an employer, an employee's speech as union representative is not in furtherance of official duties and is therefore voiced as a private citizen.  *See Ellins v. City of Sierra Madre*, 710 F.3d 1049, 1060 (9th Cir. 2013) ("Given the inherent institutional conflict of interest between an employer and its employees' union, we conclude that a police officer does not act in furtherance of his public duties when speaking as a representative of the police union.  We thus hold that a reasonable jury could find that [the officer's] speech, made as a representative and president of the police union, was made in his

8

capacity as a private citizen."); *Pekowsky v. Yonkers Bd. of Educ.*, No. 12-4090, 2014 WL 2217918, at *6 (S.D.N.Y. May 29, 2014) (same).  Lynch therefore spoke as a citizen.

Lynch's speech also raised a matter of public concern.  His speech went beyond his own concerns and touched upon basic labor organizing rights—including the right for union members to meet and speak outside the presence of management.  (*See* Lynch's Response, Ex. 4, 10068-69 (Lynch's grievance citing a violation of Municipal Employee Relations Act Sections 7-470(a)(1)-(2)).)  The enforcement of labor organizing rights of public employees is plainly a matter of public concern.

### b.  Lynch's September 2010 Suggestion that the Union Look Into a No-Confidence Vote against Defendant Ackley[4]

On September 20, 2010, Lynch suggested at a union meeting that the union consider taking a no-confidence vote against Defendant Ackley.  (Sec. Am. Comp. ¶ 26; Defs.' Stmt. of Facts ¶ 57.)  Lynch stated in his deposition testimony that his suggestion stemmed partially from the union's grievance regarding Defendant Ackley's presence at the flex-time meeting.  (Lynch's Response, Ex. 2, 317:5-13.)  Lynch further stated that the employees had a feeling that "leadership was not looking out for the employees," and that employees lacked confidence in leadership and felt the new leadership was "implementing rules, changing rules, and punishments, very rapidly."  (*Id.*, 317:23-25; 318:16-25.)  The union unanimously voted that the union board "look into what it would take [to bring a no-confidence vote against Defendant Ackley] and bring it back for a vote."  (*Id.*, 317:16-17.)

Defendants argue this suggestion of a no-confidence vote falls under *Weintraub* because it was part-and-parcel of Lynch's duties to ensure the citizens of New London were safe by

---

[4] In his Response to Defendants' Motions for Summary Judgment, Lynch raises for the first time a second no-confidence brought against Defendant Ackley at the suggestion of Lynch.  (Lynch's Response at 8, 23, 26.) Because Lynch never pled this fact in his Complaint or Amended Complaint, and because he does not cite anything in the record supporting that this second no-confidence vote occurred, I will not address it.

highlighting that Defendant Ackley was not doing her job properly.  (Def. Ackley's MSJ, at 9.)
Defendants also argue that because the no-confidence vote was made via an avenue that Lynch
would not have unless he was employed as a police officer, i.e., through a public employees'
union, it is not protected speech under *Weintraub*.  (*Id*.)

For reasons similar to those above, Defendants' argument is misplaced.  First, while the
speech may have concerned the subject matter of Lynch's employment, that is not dispositive as
to whether it is protected speech.  *Garcetti*, 547 U.S. at 421 (whether an employee's speech
"concerned the subject matter of [the speaker's] employment [is] . . . nondispositive.").  Second,
Lynch's duties as a police officer do not include acting as a union representative or taking
actions on behalf of the union.  Lynch's suggestion that the union take a no-confidence vote was
not a personal grievance made by Lynch on his own behalf, but rather, stemmed from collective
complaints of the union—or at least a reasonable juror might so find.  *See, e.g., Pekowsky*, 2014
WL 2217918, at *5.  Lynch was also actively involved in the union at this time, as shown by his
suggestion of the no-confidence vote and his grievance on behalf of the union just one month
earlier.  *Cf. Whitehead v. City of New York*, 953 F. Supp. 2d 367, 376 (E.D.N.Y. 2012) (finding
that police officer's grievance through his union was unprotected speech because he had only a
"minor role" in the union grievance process, whereas speech of an officer who was heavily
involved in the union was protected).

The Ninth Circuit has dealt with a factually similar case post-*Garcetti* and found a police
union's no-confidence vote to be protected speech.  In *Ellins*, the Ninth Circuit evaluated
whether a police officer who was actively involved with his union and led them in a no-
confidence vote against the Chief of Police had engaged in constitutionally protected speech.
*Ellins*, 710 F.3d 1049.  The officer led the union's no-confidence vote because he felt that the

chief lacked leadership ability and was unable to do her job properly.  *Id*. at 1054.  The chief contended that the vote stemmed from personnel grievances, such as internal disputes between the officers and the chief, and therefore did not touch on a matter of public concern.  *Id*. at 1057. The Ninth Circuit rejected the chief's arguments, emphasizing that the dispositive fact for purposes of "public concern" in *Connick* was not that there was a personnel grievance, but rather whether there was an *individual* personnel grievance, because "*collective* personnel grievances raised by unions may be matters of public concern."  *Id*. at 1057-58.  The Ninth Circuit then cited a series of cases in which courts had found that when an officer spoke as a union representative and expressed the concerns of the police union as a whole, the issue became a matter of public concern. *Id*. at 1058.

I agree with this analysis and find that Lynch's speech urging a no-confidence vote is protected under the First Amendment.

### c.  The Union's June 2011 Endorsement of Buscetto

In March 2011, Lynch became Vice President of the union.  (Defs.' Stmt. of Facts ¶ 4.) In June 2011, the union endorsed Michael Buscetto for mayor.  (Defs.' Stmt. of Facts ¶ 73; Defs.' MSJ, Ex. 25.)  Defendants argue that because the union—and not Lynch—endorsed Buscetto, the First Amendment rights at issue are those of the union's, not Lynch's.  (Def. Ackley's MSJ, at 10.)  While the endorsement may have been voiced by the union itself, Lynch was the union's Vice President and was active in its activities—including other activities aimed at opposing Chief Ackley.  A reasonable juror could thus find that the union's endorsement of a political candidate was informed by, and a reflection of, Lynch's own views.  There is evidence in the record supporting the notion that Defendant Ackley viewed Lynch and Buscetto as being

allied against her[5] and thus, a basis to infer that any actions she took against Lynch were motivated in part by her perception that Lynch had a role in the union's endorsement of Buscetto.

The endorsement is also protected under *Garcetti*. Nothing in Lynch's job duties can be said to encompass making a political endorsement via a union. And the content, form and context of the endorsement—a political endorsement made on behalf of "[m]embers of the New London Police Union"—all require a finding that it was on an issue of public concern. (*See* Defs.' MSJ, Ex. 25). Lynch's involvement in the endorsement is therefore protected speech.

### d. September 2011 Open Letter

In September 2011, while Lynch was Vice President of the union, the union published an "Open Letter to the Citizens of New London" in the city's newspaper. (*See* Defs.' MSJ, Ex. 46.) The letter was signed by the "New London Police Department Union, Local 724" and voiced concerns about Defendant Ackley's management and leadership of the police department following her own public statements that she could no longer effectively lead the department. (*Id.*) Defendants argue that this speech is not protected because it was "signed and endorsed by the Union, not the Plaintiff." (Def. Ackley's MSJ, at 10.) I reject this argument for the same reasons set forth above, i.e., a reasonable juror could infer that the letter reflected Lynch's views and that Defendant Ackley knew that it did.

Defendants also argue that the letter is not protected speech because to the extent it was written by Lynch, it was done pursuant to Lynch's official duties of ensuring the safety of New London's citizens and involved information that he could have obtained only from his employment. (Def. Ackley's MSJ, at 10-11.) This is not persuasive either. First, as the

---

[5] (*See, e.g.,* Lynch's Response, Ex. 7 (Defendant Ackley's emails to Kathleen Mitchell referring to Buscetto and "those that he owns", his "lynch squad", and "the police union/Buscetto union.").)

Supreme Court recently made clear in *Lane*, that the content of the letter included information obtainable only by virtue of Lynch's employment does not diminish its claim to protection under the First Amendment.  *Lane*, 134 S. Ct. at 2379 ("[T]he mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech."); *see also Garcetti*, 547 U.S. at 421 (whether an employee's speech "concerned the subject matter of [the speaker's] employment [is] . . . nondispositive.").  Second, the context—a letter sent by a public employee to a general circulation newspaper criticizing his employer—has been cited as a paradigm of protected speech by the Supreme Court in the leading case in this area.  *Garcetti*, 547 U.S. at 423-44 ("Employees who make public statements outside the course of performing their official duties retain some possibility of First Amendment protection because that is the kind of activity engaged in by citizens who do not work for the government[;] [t]he same goes for writing a letter to a local newspaper.") (citing *Pickering*, 391 U.S. 563).

Third, the fact that the letter was a response to a previous public airing of complaints by Defendant Ackley about attempts by city government officials to stymie her efforts to lead the department (*See* Defs.' MSJ, Ex. 46)—and thus formed part of a public debate—only confirms the letter's protected status.  In *Weintraub*, the Second Circuit emphasized the distinction between speech that that forms part of an already-public conversation and speech that does not. *Weintraub*, 593 F.3d at 204-205.  When explaining why the teacher's union grievance in *Weintraub* was not made as a "citizen," the court highlighted that the teacher had "never communicated with the public about the book-throwing incidents and the school administration's subsequent refusal to discipline the particular student."  *Id*. at 205.  The court distinguished this situation from *Cioffi*, a pre-*Garcetti* Second Circuit case in which the court found that a high

school athletic director's letter to his supervisor and school board criticizing the district's handling of a sexual harassment and hazing incident was protected speech. *Id.* In evaluating *Cioffi*, the *Weintraub* court found that the athletic director's letter would still constitute protected speech post-*Garcetti* because "[t]he speech at issue in *Cioffi* had been publicly disclosed and the athletic director subsequently pursued the public controversy in a press conference; thus, the 'public's interest in receiving the well-informed views' of the athletic director, as a government employee, *Garcetti*, 547 U.S. at 419, was strong." *Id.* Similarly, Lynch's letter on behalf of the union clearly states that it was written pursuant to a public statement by Defendant Ackley that she could no longer effectively lead the department. (*See* Defs.' MSJ, Ex. 46.) Under *Weintraub*, the public has a strong interest in receiving the police union's views on such a public issue. *Weintraub*, 593 F.3d at 205.

Further, the letter is also unmistakably on a matter of public concern, as shown by its content, form, and context. Besides concerning a union-related matter, the letter was in response to Defendant Ackley's public announcement that she was going to retire because of "ongoing distress caused by Councilor Buscetto" that made her "no longer able to effectively lead this department." (*See* Lynch's Response, Ex. 17.) The content of the letter thus concerns an issue that was openly being discussed in public. The letter's form also shows that it was not a private statement but an open letter addressed to the public and concerning the public. The letter was signed by the union and spoken in the voice of the collective union, thereby constituting pure union activity. *See Clue v. Johnson*, 179 F.3d 57, 61 (2d Cir. 1999) (finding First Amendment retaliation claim based on determination that actions constituted "core union activity"). The letter is plainly protected speech.

### e.  Letter Requesting That Defendant Ackley be Placed on Administrative Leave

In November 2011, Lynch became union president.  (Defs.' Stmt. of Facts ¶ 4.)  On February 10, 2012, the union sent a letter to the mayor accusing Defendant Ackley of violating a civil rights ordinance that precludes the New London Police Department ("NLPD") from inquiring into an individual's immigration status, unless it pertains directly to a criminal investigation.  (Defs.' Stmt. of Facts ¶¶ 131-32.)  The letter was signed by Lynch as union president and provided the union's response to a newspaper article that had reported that "serious allegations of conspiracy to violate civil rights have been lodged against the Chief of Police." (*See* Defs.' MSJ, Ex. 58.)  The letter "suggest[s]" that Defendant Ackley be investigated and placed on administrative leave pending completion of the investigation.  (*Id.*)  Defendants again argue that Lynch's letter is not protected speech because he spoke pursuant to his official duties, which require him to keep the public safe by alerting citizens if Defendant Ackley was putting them in danger.  (Def. Ackley MSJ at 11.)

For reasons similar to those set forth above with respect to the letter published in the newspaper, I reject this argument.  Lynch was no more acting pursuant to his official duties when authoring (or influencing) a letter to the newspaper critical of his employer than he was in authoring such a letter to the mayor.  *See Mortara v. Katkocin*, No. 05-880, 2007 WL 4105283, at *5 (D. Conn. Nov. 16, 2007) (holding that police officer's letter, written in his capacity as union president and sent to the mayor, was protected speech because, *inter alia*, it was on a topic that had been publicly debated, was written on union letterhead, and sent by officer in his capacity as union president, not as an employee).

Finally, Defendants argue that the impetus behind the letter was "to weaken and embarrass [Defendant Ackley]."  (Def. Ackley MSJ at 11, n.2.)  Under *Connick*, motive is not dispositive for determining whether a matter touches on an issue of public concern; instead, "the

primary question for First Amendment purposes is whether the matter is of public concern, not whether the speech was also made to serve some private interest." *Nagle*, 663 F.3d at 107. Lynch's letter clearly touches on a matter of public concern, even if it was motivated by personal animus. Lynch's letter therefore constitutes speech as a citizen on a matter of public concern.

### f. Lynch's October 2012 Letter to Mayor and Attendance at PSC Meeting

Around September 30, 2012, Lynch wrote a letter to the mayor regarding the union's concerns about staffing shortages that were compromising the safety of the public and the safety of police officers. (*See* Defs.' MSJ, Ex. 73.) The letter is on union letterhead and signed by Lynch as union president. (*Id.*) Shortly thereafter, Lynch was invited by the PSC to attend their October 22, 2012 meeting, in his capacity as union president and police officer. (Defs.' Stmt. ¶ 166.) At the meeting, Lynch explained why the union had written its letter to the mayor and voiced concerns that a lack of trust in the police administration was causing officers to leave. (Defs.' Stmt. ¶ 170; Defs.' Ex. 74, at 2.)

Defendants argue that because Lynch admits in his Second Amended Complaint and deposition testimony that he thought his attendance at the meeting was required both in his capacity as a police officer *and* as union president, his speech is not protected. (Def. Ackley's MSJ, at 11.) Defendants also argue that because the speech concerned staffing levels, which "directly affect" Lynch's working conditions, it is unprotected as it relates to his official job duties. *Id.*

I find that Lynch's speech at the meeting was protected. First, Lynch's attendance at the meeting must be viewed as a follow-up on the letter he sent the mayor. The letter begins by citing a string of "[r]ecent headlines" in the news about the safety of the public and police officers. (*See* Defs.' MSJ, Ex. 73.) As with the September 2011 letter and the February 2012

letter, this letter was thus weighing in on an already-public issue.  The public interest in receiving the union's views was therefore strong.  *See Weintraub*, 593 F.3d at 204-205.  The letter also addresses concerns voiced by the union at their last general membership meeting, and expresses Lynch's suggestions, "[a]s Union President," for the proposed course of action to respond to these safety-related issues raised by the prior news articles.  (*Id.*)  The role Lynch occupied was therefore that of citizen, not that of employee.

Similarly, while Lynch may have attended the meeting both in his capacity as a police officer and as union president, the minutes from the meeting show Lynch was speaking solely on behalf of the union and about the letter he sent to the mayor expressing the union's concerns. (*See* Defs.' MSJ, Ex. 74.)  Although the issue concerned staffing levels, which do affect Lynch's employment, that, again, is not dispositive.  *Garcetti*, 547 U.S. at 421.  Because Lynch was speaking in a public forum and in his capacity as his union's representative, I find that he spoke as a private citizen; and because his speech was related to the union's collective concerns regarding low morale in the department—and not his individual concerns—the speech was core union activity on a matter of public concern.  *See Clue*, 179 F.3d at 61 ("core union activity" is protected under First Amendment).  It is therefore protected.

### g.  May 2013 PSC Meeting Regarding Civilian Complaints[6]

---

[6] Lynch also alleges that he voiced his opposition to the open reading of civilian complaints at a PCRC meeting in March 2011.  (Lynch's Response, at 23.)  This allegation does not appear in the Second Amended Complaint. Further, the meeting minutes Lynch cites do not indicate that he spoke about civilian complaints.  (*See* Lynch's Response, Ex. 16, at 38-46.)  Although Defendant Ackley's September 29, 2011 email to Mitchell references Lynch's opposition to the public reading of civilian complaints (*see* Lynch's Response, Ex. 7, at 16), this email does not state when such speech occurred.  And while Defendant Ackley's email states that Lynch "started showing up as the UNION Committee member in place of Darrin O'Mara . . . [and] has been saying that cases should not be heard at all, it's not fair to the cops" (*id.*), this statement—which clearly represents Defendant Ackley's opinion on the events that occurred—does not provide enough detail for me to determine, as a matter of law, whether Lynch spoke as a citizen on a matter of public concern.  Lynch has not presented evidence as to when in 2011 such speech occurred, at which particular PCRC meeting, and most importantly, whether he spoke as a union representative or on his own behalf.

On May 20, 2013, Lynch spoke to the PSC regarding civilian complaints being read publicly.  (Defs.' Stmt. ¶ 180.)  The meeting minutes show Lynch attended and spoke in his capacity as union President, stating, in part, that "*The Union* is seeking fairness to its members." (Defs.' Ex. 76, at 2) (emphasis added).  Members of the public also attended the meeting and commented on the issue.  *Id*. at 3.

Defendants argue that Lynch's speech was compelled by his personal desire to keep civilian complaints private because Lynch had more civilian complaints than any other officer, which Lynch contests.  But even if Lynch's speech was partially driven by his personal interests, that is not dispositive.  *Sousa*, 578 F.3d at 173 (holding that an employee's "motive is not dispositive in determining whether his or her speech addresses a matter of public concern.").  Speaking out about whether civilian complaints should be read publicly falls outside the scope of Lynch's job duties as an officer.  Because Lynch attended as union president and spoke on behalf of the union, his speech was not as an employee but as a citizen.  *See Pekowsky*, 2014 WL 2217918, at *6.  And the issue of whether civilian complaints should be read openly is plainly a matter of public concern, not least because it was the subject of public debate.  (*See, e.g.*, Lynch's Response, Ex. 7, at 16 (email from Defendant Ackley to Mitchell regarding the continuing public debate about publicly reading civilian complaints.).)  Lynch's speech was therefore protected.

### h.  July 2013 PSC Meeting Regarding Retirement of Canines

On July 1, 2013, Lynch spoke at a PSC meeting in opposition to the retirement of two dogs in the Canine Unit, Buck and Bessie.  (*See* Lynch's Response, Ex. 25.)  Defendants argue this speech was unprotected because it concerned Lynch's Canine Unit, and were the unit to be eliminated, Lynch would no longer have the same job.  (Def. Ackley's MSJ at 12.)  Defendants

18

argue that Lynch's speech was simply to perform the essential functions of his job. *Id.* Lynch responds that he did not handle either of the dogs; that his duties with the Canine Unit had already been removed or limited by Defendant Ackley; and that the topic was debated in the public. (Lynch's Response, at 30).

Lynch's speech was made at a public meeting, with other members of the public present, and on a topic that had been openly debated. (*See, e.g.*, Lynch's Response, Ex. 3, at 1158 (April 21, 2012 letter from New London resident to NLPD voicing opposition to reduction of Canine Unit).) It therefore has a "relevant citizen analogue," *Jackler*, 658 F.3d at 238, and Lynch spoke as a citizen. Attendees at the meeting did address issues directly relevant to Lynch's Canine Unit; as noted, however, this factor is not determinative of whether his speech was made as a citizen on a matter of public concern. *Garcetti*, 547 U.S. at 421. Instead, the "primary question for First Amendment purposes is whether the matter is of public concern, not whether the speech was also made to serve some private interest." *Nagle*, 663 F.3d at 107. While Lynch may have had a private interest in the longevity of the Canine Unit, the public nature of the retirement of the canines (as evidenced by the public debate on the issue), and the public forum in which Lynch voiced his concerns both support a finding that his speech was on a matter of public concern. (*See* Lynch's Response, Ex. 25 (minutes from July 1, 2013 meeting summarizing discussion by members of the public on reducing Canine Unit).) Lynch's speech at the July 1, 2013 meeting was therefore protected.

### 2. Adverse Employment Action

Having defined the universe of protected speech, I must now decide whether Lynch suffered an adverse employment action. As an initial matter, Defendant Ackley argues that because § 1983 requires personal involvement of defendants in alleged constitutional

deprivations as a prerequisite to an award of damages, she may not be liable to Lynch for the incidents that she had no personal involvement in.  (*See* Def. Ackley's MSJ, at 3-4.)

The substance of Defendant Ackley's arguments are not what § 1983's "personal involvement" requirement encompasses.  While her arguments concern specific instances in which she claims she was not personally involved in the allegedly adverse actions taken against Lynch, the substance of her arguments goes towards whether she retaliated against Lynch, not whether she had "personal involvement" for purposes of § 1983.  A full review of the record raises a genuine issue of material fact as to whether Defendant Ackley, as Chief of Police overseeing Lynch's duties and those of all other department personnel, and aware of the activities alleged in his complaint, was personally involved in each of the retaliatory acts alleged.

"In the context of a First Amendment retaliation claim . . . retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action."  *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 225 (2d Cir. 2006) (quotation marks  and citing reference omitted).  To provide guidance for this "heavily fact-specific, contextual determination," the Second Circuit has set forth a nonexhaustive list of retaliatory conduct that includes discharge, refusal to hire, refusal to promote, demotion, reduction in pay and reprimand.  *Id.* at 226.  However, "lesser actions may also be considered adverse employment actions," such as negative evaluation letters, express accusations of lying, reassignment as an alleged demotion, and reduction in duties.  *Id.* (citing reference omitted).  While the conduct must be more than *de minimis*, *id.*, an accumulation of "seemingly minor incidents" may combine to establish a "critical mass" sufficient to establish a retaliation claim.  *Phillips v. Bowen*, 278 F.3d 103, 109 (2d Cir. 2002).  "[W]hether an undesirable employment

action qualifies as being 'adverse' is a heavily fact-specific contextual determination." *Zelnik*, 464 F.3d at 226 (citing reference omitted).

Lynch has alleged a long list of allegedly adverse actions taken by Defendant Ackley including denial of his compensation time and insurance opt-out; reducing his duties with the Canine Unit by assigning Sergeant Pickett, who had minimal experience with the Canine Unit, to take over the Unit and attend Canine Unit training; limiting Lynch's access to the Canine Unit drug safe; emailing Kathleen Mitchell, a member of the local media, about complaints against Lynch in an attempt to injure his reputation; repeatedly investigating and then denying Lynch's business leave to make it more difficult for Lynch to attend to union business; reassigning Lynch to the fourth squad to make other officers jealous of him; providing the mayor with inflated costs of the Canine Unit in an attempt persuade the City to eliminate the Canine Unit; and assisting in providing information to the media on racial disparity among Canine Unit bite victims in an attempt to damage Lynch's reputation.

Defendants argue that the cumulative actions listed amount to no more than *de minimis* slights. (Def. Ackley's MSJ, at 18.)  When viewed cumulatively, however, Lynch's evidence of adverse employment action is sufficient to survive summary judgment.  For example, Lynch presents enough evidence concerning the reduction in his duties with the Canine Unit and the limitations on his access to the Canine Unit drug safe[7] that a reasonable juror could find that Defendant Ackley "significantly diminished [Lynch's] material responsibilities."  *See Zelnik*, 464 F.3d at 226 (providing examples of "lesser" actions that may constitute adverse employment action, such as a demotion.)  If these actions are proven to be retaliatory, a rational jury could conclude that such actions by an employer "would deter a similarly situated individual of

---

[7] *See infra*, Causal Connection section, for a more fulsome discussion of the reduction in Lynch's duties and his restricted access to the Canine Unit drug safe.

ordinary firmness from exercising his or her constitutional rights[,] constitut[ing] an adverse action." *Id*. at 225.

Similarly, Lynch has provided evidence that Defendants' actions resulted in his coworkers' hesitating to associate with him out of fear of retaliation. (*See* Lynch's Response, Ex. 1, 80:10-17.)  Deputy Segar testified in his deposition that he tried to minimize his dealings with Lynch so that Defendant Ackley would not associate Segar with Lynch:

> Q:    Fair enough.  Other than going to the chief for decisions with regard to Mr. Lynch, did you ever take any actions to minimize your dealings with him?
>
> A:    Yes.
>
> Q:    What types of actions did you take?
>
> A:    I didn't want the chief to see Officer Lynch in my office or me associating with Officer Lynch in any capacity other than – yeah, in any capacity.

*Id*.  Lynch also testified at his deposition that "I'm much more fearful in what I say and how I say it."  (Lynch's Response, Ex. 2, 222:15-16.)  Such evidence would support a finding that Defendants' actions "would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Zelnik*, 464 F.3d at 225.  Although Defendants try to analogize the current case to *Deters*, in which the Second Circuit found that the actions taken against two police officers did not amount to adverse employment action, *Deters* did not involve evidence that the police officers' coworkers avoided associating with them out of fear of retaliation.  *See Deters v. Lafuente*, 368 F.3d 185 (2d Cir. 2004).  Thus, Lynch has submitted evidence to create a genuine issue of material fact on the issue of whether he was the subject to an adverse employment action.

**3.  Causal Connection**

Next, I must determine whether Lynch has put forth enough evidence to demonstrate a "'causal connection . . . sufficient to warrant the inference that the protected speech was a substantial motivating factor in the adverse employment action.'" *Frisenda v. Inc. Vill. of Malverne*, 775 F. Supp. 2d 486, 510 (E.D.N.Y. 2011) (citing *Cotarelo v. Vill. of Sleepy Hollow Police Dep't*, 460 F.3d 247, 251 (2d Cir. 2006)). Lynch can demonstrate this causal connection "indirectly by showing that the protected activity was followed by adverse treatment in employment, or directly by evidence of retaliatory animus." *Cobb*, 363 F.3d at 108 (internal citations and citing reference omitted). "[A] plaintiff may not rely on conclusory assertions of retaliatory motive to satisfy the causal link. Instead he must produce some tangible proof to demonstrate that his version of what occurred was not imaginary." *Id.* A retaliation claim will lie even where "the measures taken by [the defendants] were otherwise justified," so long as Lynch can prove that retaliation was a "motivating factor." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (citation omitted). "Summary judgment is precluded where questions regarding an employer's motive predominate in the inquiry regarding how important a role the protected speech played in the adverse employment decision." *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999).

Here, a reasonable jury could find that Lynch's protected speech was a motivating factor behind the many allegedly adverse actions against him. The adverse actions consistently occurred shortly after the protected speech took place. For example, within three months of Lynch's becoming Vice President of the union and speaking out against Defendant Ackley's policies at the PCRC meeting, Defendant Ackley reduced Lynch's duties with the Canine Unit by assigning Sergeant Pickett to manage the unit. (*See* Defs.' Stmt. of Facts ¶ 145.) Defendant Ackley alleges that her request to have Canine Unit training take place only when Sergeant

Pickett was monitoring reflected Captain Lacey's prior recommendation, the need to ensure accountability of the training and the Canine Unit, and the need to maintain a practical training schedule. (Defs.' Stmt. of Facts ¶¶ 146-48.)  But Lynch has presented evidence that raises a genuine issue of material fact as to whether such actions were taken for a retaliatory purpose. For example, Deputy Segar testified in his deposition that Sergeant Pickett had no experience with the Canine Unit when he was ordered to supervise it.  (Lynch's Response, Ex. 1, 87:13-15.) In addition, Captain Lacey had recommended training in December 2010, but Defendant Ackley does not explain why, in June 2011, she suddenly decided to implement his suggestion or why, in February 2012, she required that Sargeant Pickett attend all training sessions, given that Captain Lacey's recommendation was only that "a member of the command staff attend a portion of some of the training sessions in the future."  (*See* Defs.' MSJ, Ex. 61.)  Lynch has presented evidence that Defendant Ackley's request that Sergeant Pickett be present at all training occurred only two weeks after Lynch sent his union letter to the mayor calling for an investigation of Defendant Ackley.  (Lynch's Stmt. of Facts, ¶ 146; Lynch's Response, at 37.)

Similarly, Defendants argue that Defendant Ackley limited Lynch's access to the Canine Unit drug safe as part of a reevaluation of drug safe procedures following a lawsuit against the NLPD alleging that an officer had planted oxycodone hydrochloride on a suspect.  (Defs.' Stmt. at ¶ 86.)  Lynch has presented evidence demonstrating that the procedures were changed shortly after Lynch became union president and that the lawsuit was actually filed in April 2012— months *after* the safe procedures were changed.  (*See* Defs.' MSJ, Ex. 31.)  Thus, drawing all reasonable inferences in favor of the Lynch, even if "the measures taken by the defendants were otherwise justified," Lynch has presented enough evidence for a reasonable juror to find that retaliation was a "motivating factor."  *Royal Crown Day Care LLC*, 746 F.3d at 544.

In addition, Lynch has presented evidence of Defendant Ackley's hostility towards him, which tends to support his claim that her actions were driven in large part by retaliatory motive. For example, Defendant Ackley testified in her deposition that "I was being told that Todd Lynch's purpose was whatever Mike Buscetto wanted him to do to be disruptive towards the operations of the police department as it related to me." (Lynch's Response, Ex. 5, 45:18-21.) Defendant Ackley's emails to Mitchell also provide ample evidence of her animus towards Lynch:

> You're right and if people don't realize that most of the negative blogs are the result of Mike [Buscetto] and those that he owns then they must be blind.  Citizens of NL have no idea the threats Mike has sent to me and the non stop attempts to try and hurt me.  He will not have control of law enforcement as long as I'm chief, I will not turn my head and allow he and his "lynch" squad to show favor to the chosen few at the expense of those he considers less than himself.  The day is coming for me to go public with what I have endured and the secrets I know.

(Lynch's Response, Ex. 7, at 1.)  Similarly, in a later email to Mitchell, Defendant Ackley wrote "Time to throw another bomb, maybe you should send an [sic] FOI request to VIEW all law suits concerning police K-9's as well as all Civilian Complaints concerning Todd Lynch."  (Lynch's Response, Ex. 7, at 6.)  Defendant Ackley sent these emails shortly after Lynch became Vice President of the union and had the union endorse Buscetto.  Thus, Lynch has sufficiently alleged a causal connection by presenting both evidence of a retaliatory animus and a close temporal proximity between his protected activity and the adverse employment actions he experienced. Summary judgment as to this issue is denied.

### 4. *Pickering* Balancing Test

Although Lynch has established a *prima facie* case for First Amendment retaliation, Defendants argue they can avoid liability under the so-called *Pickering* balancing test.  As the

Supreme Court stated, "[t]he problem in any case is to arrive at a balance between the interests of [the employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568.

The *Pickering* balancing test allows a government employer to take adverse action against an employee for speaking on a matter of public concern if: "(1) the employer's prediction of disruption is reasonable; (2) the potential disruptiveness is enough to outweigh the value of the speech; and (3) the employer took action against the employee based on this disruption and not in retaliation for the speech." *Jeffries v. Harleston*, 52 F.3d 9, 13 (2d Cir. 1995) (citing *Waters v. Churchill*, 511 U.S. 661, 673 (1994)). "[T]he extent of the injury caused by the employee's speech need not be actual; rather, the government's burden is just to show that the speech threatened to interfere with government operations." *Id.*

Under the *Pickering* balancing analysis, "the state's burden in justifying a particular discharge varies depending upon the nature of the employee's expression." *Connick*, 461 U.S. at 150. "The more the employee's speech touches on matters of significant public concern, the greater the level of disruption to the government that must be shown." *Jackler*, 658 F.3d at 236 (citing reference omitted). In addition, "the more the employee's job requires confidentiality, policymaking, or public contact, the greater the state's interest in firing her for expression that offends her employer." *Lewis v. Cowen*, 165 F.3d 154, 162 (2d Cir. 1999) (citing reference omitted).

"Even if the *Pickering* balance is resolved in the employer's favor, the employee may still demonstrate liability by proving that the employer disciplined the employee in retaliation for the speech, rather than out of fear of the disruption." *Id.* at 163. Although the *Pickering*

balancing test is generally a question of law, a grant of summary judgment is inappropriate in cases "in which the question of the degree to which the employee's speech could reasonably have been deemed to impede the employer's efficient operation would properly be regarded as a question of fact, to be answered by the jury prior to the court's application of the *Pickering* balancing test." *Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cnty.*, 252 F.3d 545, 558 (2d Cir. 2001) (citing *Vasbinder v. Ambach*, 926 F.2d 1333, 1340 (2d Cir. 1991) (finding that because *Pickering* test raised a question of fact where the parties disagreed as to whether the speech disrupted or had the potential to disrupt, and whether plaintiffs' dismissal was because of such disruption or the content of their speech); *see also Jeffries*, 52 F.3d at 13-14 (reviewing jury's findings as to whether employer's motivation to demote employee was based on a "reasonable expectation" of disruption or retaliation for employee's speech).

Defendants argue that because Lynch's speech challenged Defendant Ackley and sought to "derail her career," the disruption of his speech to the NLPD and to Defendant Ackley's ability to manage the NLPD outweighs the value of his speech. (Def. Ackley's MSJ, at 23.) Defendants also argue that Lynch's conduct caused disruption to Defendant Ackley's ability to ensure the safety of New London citizens and interfered with Lynch's bona fide job duties. (*Id.*) Finally, Defendants argue that because the position of a police officer requires confidentiality and public contact, Defendant Ackley had more leeway in responding to Lynch's speech. (*Id.*)

I agree that much of Lynch's speech, such as the no-confidence vote and letters to the mayor, challenged Defendant Ackley's authority and could potentially cause disruption to her ability to manage the NLPD effectively. However, given the significant public concerns raised by Lynch's speech—which involved issues that were union-related, political, and openly debated

in the public—Defendants must show a heightened level of disruption. *See Jackler*, 658 F.3d at 236.

On this record, there are too many factual disputes for me to determine, as a matter of law, whether such disruption existed or was reasonably likely to exist, and whether Defendant Ackley took allegedly adverse actions against Lynch because of the content of his speech or because of any reasonable prediction of disruption. Defendants have provided only conclusory allegations that they had a reasonable prediction that Lynch's speech would disrupt the NLPD's operations. The only evidence in the record supporting any prediction of a disruption is in Defendant Ackley's deposition testimony, when, in response to questions about why she wrote her July 28, 2011 email to Mitchell referring to Lynch as part of a "lynch squad," she testified:

> A:   I was being told that Todd Lynch's purpose was whatever Mike Buscetto wanted him to do to be disruptive towards the operations of the police department as it related to me.
>
> Q:   Who told you that?
>
> A:   Deputy Chief Segar.
>
> Q:   Did you have any firsthand knowledge that Mr. Lynch was engaged in what Segar accused him of?
>
> Mr. Rose:   I'm going to object to the form, but if you understand what firsthand knowledge is in that context, you can answer.
>
> A:   Again, that's very broad, so I'm not – I think specifically we would have to go issue by issue possibly, but in general terms, no.
>
> Q:   Did you have any suspicions of anything that Mr. Lynch was engaged in to undermine you or cause a problem for you?
>
> A:   At that time, no.

(Lynch's Response, Ex. 5, 45:18-25, 46:1-11.)  Defendants have not provided any other evidence as to whether they believed there was a reasonable prediction of disruption, nor have they tied any such prediction to a particular instance of Lynch's speech.  While certain instances of Lynch's speech could arguably be disruptive or reasonably likely to disrupt—though, as discussed, Defendants have not provided sufficient evidence demonstrating either—the disruption for other instances of speech are questionable.  For example, it is unclear what disruption—predicted or actual—would result from Lynch's August 2010 grievance that Defendant Ackley's presence had chilled the union's speech, or his discussion at the July 2013 PSC meeting regarding the retirement of two canines.  Defendants have also not explained what form they reasonably predicted such disruption would take, or what form any such disruption did actually take.  Merely alleging generally that a subordinate's speaking out against a superior could, theoretically, cause disruption, is insufficient.  While I am sensitive to the NLPD's need to maintain discipline and order, Defendants have failed to provide enough evidence of disruption—anticipated or actual—to enable me to perform the balancing test as a matter of law.

Instead, there are a number of factual questions regarding any disruption, predicted or actual.  The evidence shows that much of Lynch's speech concerned issues that were already openly discussed in the public, thereby limiting its disruptive impact.  For example, Lynch's letter to the mayor in February 2012 on behalf of the union was sent in response to a newspaper article that discussed the same allegations of civil rights violations by Defendant Ackley.  (Defs.' MSJ, Ex. 58.)  Similarly, Lynch's September 2011 open letter in the newspaper on behalf of the union was in response to Defendant Ackley's prior public statement that she would be retiring.  (Defs.' MSJ, Ex. 46.)  Lynch's letter added to this discussion but did not create the initial conversation that could cause disruption to the NLPD—Defendant Ackley's own statement

did—or at least a reasonable juror could so find.  And Lynch's speech at the July 2013 PSC meeting was about reduction of the Canine Unit, an issue that was already being publicly debated in New London.  (*See, e.g.*, Lynch's Response, Ex. 3 at 1158 (letter from New London resident to NLPD voicing opposition to reduction of Canine Unit)); (*see also* Lynch's Response, Ex. 25) (minutes from July 1, 2013 meeting summarizing discussion by members of the public on reducing the Canine Unit.)  Because much of Lynch's speech that might otherwise be regarded as disruptive was made in response to previous public statements by Defendant Ackley and others, and generally consisted of comment in an ongoing public debate not initiated by Lynch, the disruptive weight accorded to such speech in the Pickering balancing is relatively light.  In addition, besides providing a conclusory statement that Lynch's duties required public contact, Defendant Ackley has also not shown why the speech of a Canine Unit police officer should be held to the higher standard applied to a policymaking employee.  *Cf. Lewis*, 165 F.3d at 165 (holding that plaintiff's job as chief of state lottery unit was one of a senior policymaking employee required to publicly support and convey the lottery's position, thereby allowing the government greater leeway to act on plaintiff's disruptive speech).

There is also evidence that Defendant Ackley did not regard Lynch's speech as substantially disruptive.  While Defendants allege Lynch's speech interfered with his bona fide job duties, there is evidence in the record suggesting otherwise.  Lynch received seven Supervisor Observation Reports—essentially performance reviews—during the relevant period, all of which were positive, describing his work as "thorough and efficient" and stating that "[h]is training and experience is a great asset" and that he showed "[e]xemplary effort, diligence, professionalism and pride." (Lynch's Response, Ex. 24, DEFENDANTS001824).  His personnel file even contains "Letters of Acknowledgment" from Defendant Ackley herself that commend

him repeatedly for the "hard work," "teamwork," and "professionalism" he demonstrated at various NLPD events and while on duty. (Lynch's Response, Ex. 24, DEFENDANTS001734-44.)

Given these factual questions about whether there was an actual disruption or reasonable likelihood of disruption, I cannot properly perform the *Pickering* balancing test. As the Second Circuit has stated, summary judgment in such a situation would be inappropriate:

> Making these determinations correctly depends on an evaluation of conflicting testimonial evidence, which a factfinder is in the best position to evaluate. It would be improper at this stage for the district court . . . to resolve the factual disputes between the parties, or to decide the proper balance between the parties' interests. Accordingly, after these underlying factual disputes are decided by a factfinder, the district court should consider the factual findings to come to its own legal conclusions about whether the employer's interest in efficiency of the employee's interest in free speech is paramount.

*Gorman-Bakos*, 252 F.3d at 558.

I therefore deny summary judgment on this issue because "the degree to which [Lynch's] speech could reasonably have been deemed to impede [Defendants'] efficient operation would properly be regarded as a question of fact, to be answered by the jury prior to the court's application of the *Pickering* balancing test." *Id*. at 557; *see also Jeffries*, 52 F.3d at 13-14.

Finally, as shown below, there are also genuine issues of material fact as to why adverse actions were taken against Lynch and, in particular, whether the actions were taken to counter any disruptive effect of his speech or to retaliate against him. *See Jeffries*, 52 F.3d at 13-14 (evaluating jury's determinations as to whether employer was "motivated" to demote employee based on a "reasonable expectation" of disruption or an "improper retaliatory motive").

### 5. *Mt. Healthy* Defense

Defendants argue that under the *Mt. Healthy* defense, they may avoid liability by demonstrating, by a preponderance of evidence, that they would have taken the same adverse action regardless of Lynch's protected speech. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977).  In evaluating this defense, a court must refrain from granting summary judgment where "questions regarding an employer's motive predominate in the inquiry regarding how important a role the protected speech played in the adverse employment decision." *Mortara*, 2007 WL 4105283, at *7 (citing *Morris*, 196 F.3d at 110).

Defendants argue that "any action taken against the Lynch was a direct result of his insubordinate behavior and disrespect towards Chief Ackley." (Def. Ackley's MSJ, at 24.)  Yet besides this conclusory statement, Defendants do not distinguish between Lynch's "insubordinate behavior" and his protected speech.  As discussed above, Lynch has presented sufficient evidence to support a jury finding that he was disciplined for his protected speech, and that Defendant Ackley acted largely due to retaliatory motives.  And while the evidence demonstrates that Lynch did have complaints filed against him related to his duties in the Canine Unit, the Defendants do not allege that they acted against Lynch because of these complaints and not because of his protected speech.  Resolving all ambiguities and drawing all inferences in favor of Lynch, as I must, I find he has presented sufficient evidence to create a disputed issue of fact as to Defendants' motive and whether Defendants would have taken the same actions against him absent his protected speech.

### B.  Lynch's First Amendment Association Claims

Lynch also alleges that Defendants' retaliatory conduct violated his right to freedom of association.  The Constitution protects two "freedoms of association": intimate association and expressive association.  *Roberts v. United States Jaycees*, 468 U.S. 609, 617-18 (1984).  To

establish a First Amendment retaliation claim based on associational conduct, Lynch must demonstrate that his associational conduct was constitutionally protected, that Defendants took an adverse action against him, and that there was a causal connection between the adverse action and the protected conduct.  *See Cobb*, 363 F.3d at 107-08 (applying this test to evaluate validity of a freedom of association claim).  As with a speech-retaliation claim, "a public employee bringing a First Amendment freedom of association claim must persuade the court that the associational conduct at issue touches on a matter of public concern."  *Id*. at 102.  Thus, whether an associational claim addresses a matter of public concern is "determined by the content, form and context of a given statement, as revealed by the whole record."  *Connick*, 461 U.S. at 147-48.

Drawing all inferences in Lynch's favor, I find that he has presented sufficient evidence of his union activity and his political association with Buscetto, a mayoral candidate and city councilman, to demonstrate "expressive association" touching on a matter of public concern.  In *Clue*, the Second Circuit held that "retaliation solely for union activity raises a public concern under *Connick*."  *Clue*, 179 F.3d at 61.  As discussed above, all of Lynch's protected activity, except for his speech at the July 2013 PSC meeting, related to his "core union activity" that constitutes associational conduct on a matter of public concern.  *See id*. (upholding First Amendment claim after determining that the actions at issue constituted "core union activity").  Because the subject of Lynch's First Amendment speech claim and his First Amendment associational claim involve the same union-related activity (except for his speech at the July 2013 PSC meeting), the remainder of the analysis on Lynch's First Amendment association claim is the same as the analysis of his First Amendment speech claim.  *See Mortara*, 2007 WL 4105283, at *9 (holding that police officer's core union activity was protected under both his

speech claim and associational claims so that the same First Amendment analysis applied to both claims).

The record demonstrates that Defendant Ackley was well aware of Lynch's role in the union and his association with Buscetto.  (*See, e.g.*, Lynch's Response, Ex. 7, at 1 (email from Defendant Ackley to Mitchell: "[I]f people don't realize that most of the negative blogs are the result of Mike [Buscetto] and those that he owns then they must be blind . . . He will not have control of law enforcement as long as I'm chief, I will not turn my head and allow he and his "lynch" squad to show favor to the chosen few.")); (*see also* Lynch's Response, Ex. 7, at 16 (email from Defendant Ackley to Mitchell discussing Buscetto and Lynch's related involvement in the PCRC and union).)

Therefore, for reasons similar to those set forth above, I reject Defendants' argument that Lynch's associational conduct is unprotected because he engaged in those associations to further his official job duties.  (*See* Def. Ackley's MSJ at 26.)[8]  To the extent Defendants seek to argue that Lynch's associational conduct is barred under *Garcetti* and its progeny, I reject that argument for reasons similar to those set forth above with respect to speech.  To the extent *Garcetti* applies to claims based on the First Amendment's freedom of association, there is no evidence in the record that Lynch's association with a mayoral candidate or his union activities were "part and parcel" of his duties as a police officer.  My findings as to causation and the defenses raised by Defendants are the same as above.  Thus, because I find there is a disputed issue of material fact as to whether Defendants retaliated against Lynch based on his protected associations, *see infra*, summary judgment as to Lynch's associational claim is denied.

## C.  Qualified Immunity

---

[8] Defendants also argue that Lynch's associational claim is barred because he does not have standing to assert the rights of others.  (Def. Ackley's MSJ at 26-27.)  This argument confuses third party standing—which Lynch is not alleging—with a protected associational claim under the First Amendment, which Lynch *has* sufficiently alleged.

Defendant Ackley moves for summary judgment as to Lynch's First Amendment claims on qualified immunity grounds. Qualified immunity insulates government officials from personal liability when they perform discretionary duties "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A government official is entitled to qualified immunity "(1) if the conduct attributed to him was not prohibited by federal law; or (2) whether that conduct was so prohibited, if the plaintiff's right not to be subjected to such conduct by the defendant was not clearly established at the time it occurred; or (3) if the defendant's action was objectively reasonable at the time it was taken." *Munafo v. Metro. Transp. Auth.*, 285 F.3d 201, 210 (2d Cir. 2002) (internal quotations omitted).

Because I have already found that an issue of fact exists regarding a violation of Lynch's constitutional rights to free speech and association, I must now determine whether Defendants' conduct violated a "clearly established" law, such that Defendants could have reasonably anticipated that their conduct would violate Lynch's First Amendment rights. However, because I have found that factual questions prevent me from determining the outcome of the *Pickering* balancing test, factual questions also preclude me from making a qualified immunity determination. In other words, before determining qualified immunity as a matter of law, I must first determine whether Defendants made a reasonable prediction of disruption that outweighed Lynch's speech rights. This requires a resolution of the merits of Lynch's First Amendment claim, which, for the reasons discussed above, cannot be done without first obtaining the assistance of a factfinder. As the Second Circuit has made clear:

> The facts as developed at trial may show that [plaintiff] was so disruptive to the effective and efficient operation of [his employer] that a reasonable and prudent [employer] could not have anticipated that their actions violated [plaintiff's] first amendment

> rights.  Alternatively, the facts may show disruption so minimal
> that a reasonable and prudent [employer] would have to anticipate
> that disciplining [plaintiff] was in retaliation for protected speech.
> Since the immunity in question cannot be decided without
> addressing [plaintiff's] underlying claims on the merits, the claim
> of qualified immunity does not turn on an issue of law.

*DiMarco v. Rome Hosp. & Murphy Mem'l Hosp.*, 952 F.2d 661, 666 (2d Cir. 1992) (internal

citations and quotation marks omitted).

A qualified immunity finding would therefore be inappropriate until a factfinder resolves

the underlying factual disputes.  For this reason, I deny summary judgment.

### D.  Defendant City's Municipal Liability Under Section 1983

Defendant City argues that Lynch's § 1983 claims against the City of New London fails

as a matter of law.  A municipality may not be held liable under § 1983 on a theory of

*respondeat superior*.  *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978).  A

municipality may be held liable under § 1983 only if the conduct that caused the constitutional

deprivation was undertaken pursuant to a policy or custom of the municipality.  *Id*. at 690-91.

The "injury [must be] inflicted by [the municipality's] lawmakers or by those whose edicts or

acts may fairly be said to represent official policy."  *City of St. Louis v. Praprotnik*, 485 U.S.

112, 121-22 (1988) (internal quotation marks and citation omitted).  The Supreme Court has

explained that "only those municipal officials who have 'final policymaking authority' may by

their actions subject the government to § 1983 liability."  *Id*. at 123 (quoting *Pembaur v.*

*Cincinnati*, 475 U.S. 469, 483 (1986)).  In addition, a municipal officer subjects a municipality to

§ 1983 liability "where—and only where—a deliberate choice to follow a course of action is

made from among various alternatives by the official or officials responsible for establishing

final policy with respect to the subject matter in question."  *Pembaur*, 475 U.S. at 483.  An

official does not become a final policymaker in a particular area merely by exercising discretion in that area.  *See id.* at 481-82.  Further:

> When an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality. Similarly, when a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with *their* policies. If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final.

*Praprotnik*, 485 U.S. at 127.  Determining the identity of the final policymaker is a question of law, to be determined by reference to state law.  *Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir. 2000).

Lynch argues that Defendant Ackley is the final policymaking official for "the policies that have affected Plaintiff."  (Lynch's Response, at 13.)  More precisely, in his Second Amended Complaint, Lynch alleges that "[t]he City of New London, by and through its decision and policy maker Ackley, retaliated and disciplined the Plaintiff by way of adverse employment actions against him in violation of 42 U[.]S[.]C[.] § 1983."  (Sec. Am. Comp. ¶ 84.)

In his opposition brief, Lynch argues that Defendant Ackley is the final policymaker with respect to personnel issues because she has authority to rescind or amend the General Duty Manual ("GDM"), which governs personnel issues in the department.  Specifically, the GDM states that "[a]ll rules, regulations, and procedures in this manual are in full force and effect until canceled or amended by general order issued by the Chief of Police of the New London Police Department" and that "[t]he Chief of Police has the authority to issue, amend, and rescind any General Order."  (Lynch's Response, Ex. 11, at 14-15.)  Lynch also points to Defendant Ackley's job description, which states that the "City Manager proscribes general policies . . . and advises as to procedures when extraordinary situations arise, but the Chief of Police has

complete internal control over police activities and personnel, and exercises wide discretion in the supervision and administration of the Department." (*See* Lynch's Response, Ex. 23.)

But Lynch fails to tie any of the allegedly retaliatory actions taken by Defendant Ackley to any general order, rule, or regulation issued by Defendant Ackley. Indeed, none of the actions taken by Defendant Ackley of which Lynch complains resemble "policies" of Defendant City. Rather, when read in the light most favorable to the Lynch, they appear to be a series of ad hoc reactions to his speech. Only a few of them applied to others besides him, and none appear to have been adopted through any kind of deliberative process or to reflect "a deliberate choice to follow a course of action . . . made from among various alternatives. . . ." *Pembaur*, 475 U.S. at 483. Lynch points to nothing in the GDM or collective bargaining agreement ("CBA") that was established by Defendant Ackley and designed to retaliate against Lynch or similarly situated employees.

Further, the City Charter makes clear that all personnel-related decisions Defendant Ackley took were subject to review, thereby precluding a finding that she is the final policymaker in this arena. Before December 2010, the City Charter provided that the City was governed by an elected City Council that held all legislative powers (Defs.' Reply, Ex. 5, § 21) and was required to appoint a City Manager to serve as the Chief Executive Officer of New London. (*Id*. § 39.) The City Manager was in charge of appointing the Chief of Police, and the Charter made clear that "the chief of police, and the other officers, members, and employees of the police force shall be under [the City Manager's] control in the performance of [the City Manager's] duties as the chief executive of the city." (*Id*. § 73; *see also id*. § 44 ("All [administrative directors and head] officers shall be responsible to the city manager.") After being amended in December 2010, the City Charter provided that as of November 8, 2011, the

appointed City Manager was to be replaced by an elected mayor, who would assume the City Manager's duties relative to the police department.  (Defs.' MSJ, Ex. 87.)

Under both versions of the City Charter, personnel decisions made under the GDM and the CBA were subject to higher review.[9]  Under the collective bargaining agreement, personnel decisions made by the Chief of Police that result in grievances "concerning the discharge, suspension, demotion or other discipline of an employee" (Defs.' MSJ, Ex. 56, at ¶ 93) are subject to a four-step review process.  (*Id.*)  At steps one and two, the Chief is involved; at step three, however, the aggrieved party may appeal his or her unresolved grievance to two higher levels.  (*Id.*)  Before the City Charter was amended, the third level of review was provided by the City Manager (Defs.' MSJ, Ex. 10 § 9.2); after the amendment, the mayor provided this review. (Defs.' MSJ, Ex. 56, § 9.2.)  In addition, the collective bargaining agreement at all times also provided a fourth level of review via arbitration.  (Defs.' MSJ, Ex. 10 § 9.3; Ex. 56, § 9.3.)  The Chief of Police is not involved at steps three and four.

Although Defendant Ackley may have exercised wide discretion in supervising and administering personnel issues, an official does not become a final policymaker in an area merely by exercising discretion in that area.  *Pembaur*, 475 U.S. at 481-82.  Because Defendant Ackley's personnel decisions were at all relevant times subject to higher review, she is not the final policymaker in this area under *Monell*.  *See Praprotnik*, 485 U.S. at 127 ("[W]hen a subordinate's decision is subject to review by the municipality's authorized policymakers, [the policymakers] have retained the authority to measure the official's conduct for conformance with *their* policies."); *see also Albert v. City of Hartford*, 529 F. Supp. 2d 311, 331 (D. Conn. 2007) (holding that the Chief of Police was not the final policymaker because of "the presence of

---

[9] General orders are incorporated into the CBA.  (*See* Defs.' Reply at 7; *see also* Defs.' MSJ, Ex. 56, ¶ 9.2 (CBA's "Grievance Procedures" state that "The City and the Union shall recognize and adhere to all provisions of laws, ordinance, *the police manual* and personnel rules and regulations") (emphasis added).)

review mechanisms").   Although Lynch argues that grievances may be resolved at step one without further review, Lynch presents no evidence that Defendant Ackley—and not the aggrieved party—decides whether the grievance may be appealed for additional review.  (*See* Lynch's Response, at 16.)  Indeed, Lynch has not disputed that many of his own grievances have either been decided or remain pending before the arbitration panel at step four.  (*See* Defs.' Reply, at 7 n.22.)  Lynch also cites no evidence that Defendant Ackley was the final policymaker with respect to provisions of the CBA that governed his union-related activity.

The Second Circuit case Lynch relies on is distinguishable from the present situation. *See Mandell v. County of Suffolk*, 316 F.3d 368 (2d Cir. 2003).  *Mandell* involved municipal liability based on the actions of a police commissioner in Suffolk County.  The *Mandell* decision states that the defendant, "as the Suffolk County Police Commissioner, had authority to set department-wide personnel policies."   316 F.3d at 385.   As shown, Lynch has failed to demonstrate that the same can be said for Defendant Ackley, who was subject to legal provisions particular to New London.  Because *Monell* liability in this context hinges on applicable state law, *Praprotnik*, 485 U.S. at 924 ("We begin by reiterating that the identification of policymaking officials is a question of state law"), *Mandell* does not help Lynch here.

Thus, Defendant City's motion for summary judgment as to the § 1983 claim against the City of New London is GRANTED.

### E.  Lynch's Claim under Connecticut General Statute Section 31-51q

Defendant City moves for summary judgment on Lynch's claim against it under § 31-51q.  The statute provides as follows:

> Any employer, including the state and any instrumentality or political subdivision thereof, who subjects any employee to discipline or discharge on account of the exercise by such employee of rights guaranteed by the first amendment to the

> United States Constitution or section 3, 4, or 14 of the Constitution of the state, provided such activity does not substantially or materially interfere with the employee's bona fide job performance or the working relationship between the employee and the employer, shall be liable to such employee for damages caused by such discipline or discharge . . . .

Conn. Gen. Stat. § 31-51q.  "The determination of whether plaintiff was exercising his rights under the First Amendment, or equivalent purposes of the Connecticut Constitution, and whether he was fired because of exercising those rights, is made using the same analysis for determining First Amendment retaliation claims made pursuant to section 1983."  *Mortara*, 2007 WL 4105283, at *14 (citing *Vince v. Worrell*, No. 86-0319386, 1992 WL 172135, at *12 (Conn. Super. 1992)).  As noted, I have already found that Lynch engaged in protected speech.[10]

Defendant City argues that the prohibition against "discipline or discharge" in § 31-51q is narrower than the prohibition against "adverse actions" that forms part of the § 1983 analysis.  Because Lynch was never fired, the question is whether the actions Defendant Ackley took against him constituted "discipline" under § 31-51q.  While the term has no statutory definition, several Connecticut trial courts have construed its meaning.  *See, e.g.*, *Bombalicki v. Pastore*, No. 378773, 2000 WL 726839 (Conn. Super. Ct. May 10, 2010); *Matthews v. Dep't of Public Safety*, No. HHDCV116019959S, 2013 Conn. Super. LEXIS 1291 (Conn. Super. Ct. May 31, 2013).  In *Bombalicki*, the court determined the scope of "discipline" under § 31-51q by examining the statute's text and legislative history, as well as dictionary definitions and other Connecticut statutes.  *Bombalicki*, 2000 WL 726839, at *4.  Comparing the state statute's prohibition against "discipline" with the adverse employment actions prohibited by Section 1983 and Title VII, the court concluded that "[t]he language of § 31-51q, which . . . is restrictive even

---

[10] The Connecticut Supreme Court has yet to determine whether *Garcetti* applies to claims under § 31-51q asserting the violation of expressive rights under the Connecticut Constitution.  I need not reach this issue because I have found that *Garcetti* is not an obstacle to Lynch's claims.

by Connecticut standards, simply cannot compare with the expansive texts of these asserted federal counterparts." *Id*. at 5. Relying on *Bombalicki*, the Second Circuit observed that "discipline" under § 31-51q "involves affirmative acts of punishment that (at least while the punishment is being inflicted) leave the recipients in a less happy state than that which they enjoyed before the punishment began." *Avedisian v. Quinnipiac Univ.*, 387 Fed. App'x 59, 61 (2d Cir. 2010) (quoting *Bombalicki*, 2000 WL 726893, at *3).

In *Matthews*, however, the court arguably articulated a broader definition, holding that "'discipline' can be a collection of smaller incidents and conduct, as long as that conduct is affirmative in nature" and that while "some of the conduct might not be discipline on its own, [] when all the alleged conduct is aggregated and viewed in a light most favorable to the plaintiff, it can be inferred that the defendant was disciplining the plaintiff for speaking out on certain matter." *Matthews*, 2013 Conn. Super. LEXIS 1291, at *37, 40.

Other Connecticut trial courts have defined "discipline" under § 31-51q as:

> adverse employment action short of discharge which creates a material employment disadvantage. Such adverse employment actions may include demotion, suspension, reduction in pay, reprimand, significantly diminished responsibilities but may also include lesser affirmative acts of punishment or deprivation taken by the employer which leave an employee less well off and which in combination and in their totality, create a working environment that is unreasonably inferior, hostile or adverse to the employee when compared to atypical or normal, not ideal or model, workplace. Incidents that are relatively minor and infrequent such as change of working conditions that is a mere inconvenience or simply alters an employee's job responsibilities, personality conflicts at work that generate antipathy and snubbing by supervisors and co-workers will not meet this standard.

*Charron v. Town of Griswold*, No. KNLCV065000849S, 2009 WL 5511272, at *11 (Conn. Super. Ct. Dec. 14, 2019); *see also Kahn v. Connecticut Dep't of Mental Health & Addiction*

*Servs. et al.*, No. FSTCV095010654, 2011 WL 3278543 (Conn. Super. Ct. July 7, 2011) (applying *Charron*'s definition of "discipline").

Although there is not uniformity amongst Connecticut courts as to how broadly "discipline" should be construed, I find that the actions Lynch alleges Defendant Ackley took against him are best analyzed under the approach taken by the *Matthews* and *Charron* courts. Like this case, those cases both involved a series of actions taken over a period of time that, when viewed in the aggregate, could amount to "discipline." Although *Bombalicki* provided a narrower definition of "discipline" than *Matthews* and *Charron*, the court was only evaluating whether a single instance of a failure to promote amounted to "discipline," *Bombalicki*¸ 2000 WL 726839, at *1, and therefore did not have the opportunity to address whether a series of actions could cumulatively amount to "discipline."

Resolving all ambiguities and drawing all inferences in favor of Lynch, as I must, I find there is a question of material fact as to whether Lynch was "disciplined" that precludes me from granting summary judgment. When viewed in the aggregate, these actions, including the significant reduction in Lynch's duties with the Canine Unit and restrictions on his access to the Canine Unit drug safe, raise a sufficient question of fact as to whether Defendants disciplined him for his speech. *Matthews*, 2013 Conn. Super. LEXIS 1291, at *40. Thus, Defendant City's motion for summary judgment as to Lynch's claim under Section 31-51q is denied.

### F.  Lynch's Libel Per Se Claims

Lynch brings four counts of libel per se against Defendant Ackley related to emails she sent to Kathleen Mitchell, a "local talk show host, and known political gadfly, frequent blogger/poster . . . [and] candidate for mayor of the City of New London in April of 2011." (Sec. Am. Comp. ¶ 12.) To establish a prima facie case of defamation, Lynch must demonstrate that

43

"(1) the defendant published a defamatory statement; (2) the defamatory statement identified the plaintiff to a third person; (3) the defamatory statement was published to a third person; and (4) the plaintiff's reputation suffered injury as a result of the statement." *Cweklinsky v. Mobil Chem. Co.*, 267 Conn. 210, 217 (2004) (citing reference omitted).  "A defamatory statement is defined as a communication that tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Id*.  A statement must be false to be actionable as defamation.  *Goodrich v. Waterbury Republican-American, Inc.*, 188 Conn. 107, 112 (1982).  With each publication of a defamatory statement by a defendant, a new cause of action arises.  *Cweklisnky*, 267 Conn. at 217.

"Defamation is comprised of the torts of libel and slander:  slander is oral defamation and libel is written defamation." *Skakel v. Grace*, No. 3:12-cv-01669, 2014 WL 902675, at *4 (D. Conn. March 7, 2004) (citing *Mercer v. Cosley*, 110 Conn. App. 283, 297 (2008)).  Libel per se is libel "the defamatory meaning of which is apparent on the face of the statement and is actionable without proof of actual damages." *Battista v. United Illuminating Co.*, 10 Conn. App. 486, 492 (1987).  "Two of the general classes of libel which, it is generally recognized, are actionable per se are (1) libels charging crimes and (2) libels which injure a man in his profession and calling." *Id*. at 492 (citation omitted).

A public official cannot prevail in a defamation suit unless he establishes, with "convincing clarity," that the defendant published a defamatory statement with actual malice— that is, with knowledge that the statement was false or with reckless disregard of whether it was false or not.  *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964); *see also Holbrook v. Casazza*, 204 Conn. 336, 342 (1987) (clear and convincing proof of actual malice is required when alleged defamation is against a public figure).  A speaker acts with reckless disregard of

the falsity of his statement if he "entertained serious doubts as to the truth" of his statement, *St. Amant*, 390 U.S. 727, 731 (1968), or if he possessed a "high degree of awareness of [his statement's] probable falsity." *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964). A negligent misstatement of fact will not suffice to prove actual malice. *Gallo v. Barile*, 284 Conn. 459, 464 n.6 (2006). "Further, proof that a defamatory falsehood has been uttered 'with bad or corrupt motive' or with an intent to inflict harm will not be sufficient to support a finding of actual malice; although such evidence may assist in drawing an inference of knowledge or reckless disregard of falsity." *Holbrook*, 204 Conn. at 346-47 (internal citations omitted).

A statement must be false to be actionable as defamation. *Goodrich*, 188 Conn. at 112. "Contrary to the common law rule that required the defendant to establish the literal truth of the precise statement made, the modern rule is that only substantial proof need be shown to constitute the justification." *Id*. at 112-113 (citing references omitted). "It is not necessary for the defendant to prove the truth of every word of the libel. If he succeeds in proving that 'the main charge, or gist, of the libel' is true, he need not justify statements or comments which do not add to the sting of the charge or introduce any matter by itself actionable." *Id*. at 113 (citing references omitted). "[M]inor errors that do not change a reader's perception of the statement do not make the statement actionable." *Strada v. Connecticut Newspapers, Inc.*, 193 Conn. 313, 323 (1984) (citing *Goodrich*, 188 Conn. at 113). "The issue is whether the libel, as published, would have a different effect on the reader than the pleaded truth would have produced." *Goodrich*, 188 Conn. at 113. "While at common law, truth was an affirmative defense to be pleaded by the defendant, as a practical matter the burden of proving the falsity of the publication has been shifted to the plaintiff, in light of *New York Times Co.* an its progeny." *Id*.

at 112, n.6.  The "determination of the truthfulness of a statement is a question of fact for the jury." *Cweklinsky*, 267 Conn. at 229.

The parties do not dispute that Lynch, a police officer, is a public official for purposes of his defamation claims.  (*See* Def. Ackley's MSJ, at 35; Lynch's Response, at 8.)  Nor do the parties dispute whether the allegedly defamatory statements identified Lynch to a third party or were published to a third party.  I therefore limit my analysis to the issues whether the emails (1) injured Lynch's reputation, (2) were written with actual malice, and (3) were true.  Because each of the four defamation claims relates to a different email, each email is discussed separately below.

### a.  July 28, 2011 Email

Defendant Ackley's July 28, 2011 email to Mitchell states:

> Thank you for making people think.  You're right and if people don't realize that most of the negative blogs are the result of Mike and those that he owns then they must be blind.  Citizens of NL have no idea the threats Mike has sent to me and the non stop attempts to try and hurt me.  He will not have control of law enforcement as long as I'm chief, *I will not turn my head and allow he and his "lynch" squad to show favor to the chosen few* all at the expense of those he considers less than himself.  The day is coming for me to go public with what I have endured and the secrets I know.

(Lynch's Response, Ex. 7, at 1 (emphasis added).)  First, Defendant Ackley argues this email is not defamatory.  A "defamatory statement is defined as a communication that tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him."  *Cweklinsky*, 267 Conn. at 217.  Because libel is actionable per se when it will "injure a man in his profession and calling," *Battista*, 10 Conn. App. at 492, I find Defendant Ackley's email is actionable because it tends to harm Lynch's

reputation by implying that he is part of the a "lynch" squad arrayed against New London's Chief of Police.

Defendant Ackley also argues that Lynch has failed to demonstrate actual malice, that the email only expresses her opinion, and that it is true.  (*See* Def. Ackley's MSJ, at 36-39.)  I agree that Defendant Ackley's email only expresses her opinion and therefore do not address her other arguments.

"In a libel action . . . statements of fact usually concern a person's conduct or character. An opinion, on the other hand, is a personal *comment* about another's conduct, qualifications or character that has some basis in fact."  *Goodrich*, 188 Conn. at 111 (internal citation omitted). Further:

> This distinction between fact and opinion cannot be made in a vacuum, however, for although an opinion may appear to be in a form of a factual statement, it remains an opinion "if it is clear from the *context* that the maker is not intending to assert another objective fact but only his personal comment on the facts which he has stated.  Thus, while this distinction may be "somewhat nebulous, . . . [t]he important point is whether ordinary persons hearing or reading the matter complained of would be likely to understand it as an expression of the speaker's or writer's opinion, or as a statement of existing fact."

*Id*. at 111-12 (internal citations omitted).  "[T]he constitutional protection afforded statements of opinion is not lost simply because the opinion is expressed through the use of figurative or hyperbolic language."  *Mr. Chow of New York v. Ste. Jour Azur S.A.*, 759 F.2d 219, 223 (2d Cir. 1985).  The Second Circuit has set forth four factors that provide "guidance" for determining whether a statement is a fact or opinion:  (1) "examine both the context in which the statements are made and the circumstances surrounding the statements;" (2) "look at the language itself to determine if it is used in a precise, literal manner or in a loose, figurative or hyperbolic sense;" (3) examine the statements to determine if "they are objectively capable of being proved true or

47

false;" and (4) if the above analysis indicates that the statement is an opinion, "determine if it implies the allegation of undisclosed defamatory facts as the basis for the opinion." *Id*. at 226. The determination of whether a statement is opinion or rhetorical hyperbole as opposed to a factual representation is a question of law. *Id*. at 224.

Using the factors above to guide me, I find that Defendant Ackley's email was her opinion, not a statement of fact. The context of her email supports a finding that Defendant Ackley was expressing her opinion. Defendant Ackley was replying to Mitchell's email concerning Mitchell's opinion that Buscetto was hostile to Defendant Ackley. When viewed in this context, Defendant Ackley's statements—such as "You're right and if people don't realize that most of the negative blogs are the result of Mike and those that he owns then they must be blind"—support a finding that she was responding to Mitchell's email with her *own* subjective opinion as to the actions of Buscetto and his affiliates, including Lynch. A reasonable person would thus interpret this email as Defendant Ackley's personal *comment* on Lynch, not objective facts about him, i.e., a reasonable person would not be led to believe that Buscetto *owned* Lynch, or that there really was a "lynch squad." *Goodrich*, 188 Conn. at 111. Lynch's argument to the contrary—that Defendant Ackley's email implies undisclosed defamatory facts—is therefore unavailing, because a reasonable person would not construe her opinion in such a manner.

The language of Defendant Ackley's email—such as "they must be blind" and "his 'lynch squad'"—further suggest that she was expressing her own opinion because they show that she used language in a "loose, figurative or hyperbolic sense." *Mr. Chow*, 759 F.2d at 229 (finding that allegedly defamatory statements were constitutionally protected opinion because "[t]he average reader would understand the author's statements to be attempts to express his opinions through the use of metaphors and hyperbole."). The suggestion that Buscetto "owns"

Lynch and that there is a "lynch squad" are not statements objectively capable of being proven true or false.  I therefore find Defendant Ackley's email contains her constitutionally protected opinions and GRANT summary judgment as to this claim of libel per se.

### b. August 31, 2011 Email

Next, Lynch alleges that Defendant Ackley's August 31, 2011 email to Mitchell was defamatory.  In relevant part, the email states:

> If you look at everything for the last four years, that will show what Lynch's biting dog cost the city and how it needed to be addressed.  As for Civilian complaints and supervisor complaints, it will show a history of problems that people have no idea about.

(Lynch's Response, Ex. 7, at 15.)  Defendant Ackley presents two arguments: that the email is true, and that Lynch has failed to demonstrate that Defendant Ackley wrote this email with actual malice.  (Def. Ackley's MSJ, at 36-40.)

After reviewing the record and drawing all inferences in favor of Lynch, I find that "the main charge, or gist" of Defendant Ackley's email is true.  The record demonstrates that Lynch's Canine Unit had "cost" the city.  For example, an evaluation of Lynch's Canine Unit provided to the mayor found that:

> [T]he elimination of [the Canine Unit] would reduce the potential for claim severity and would be viewed as a positive risk management move. From the City's cost perspective, since 7/1/2009, there have been two claims (4/30/2010 & 11/16/2010) filed that fell under Law Enforcement Liability coverage deductibles for a total of $45,414 that was billed to and paid by the City.

(Defs.' MSJ, Ex. 64.)  In addition, the Canine Unit also "cost" the city in a reputational sense because of allegations of racial disparity among bite victims.  The President of New London's National Association for the Advancement of Colored People ("NAACP") submitted an affidavit that in his capacity as President, he had "received complaints from citizens and through the

Freedom of Information Act about persons bitten by New London Police Department K9s to determine racial disparity.  Some of these citizen complaints and information included incidents involving the Plaintiff, Todd Lynch, and his K9."  (Defs.' Reply, Ex. 1, ¶¶ 5-6.)   Lynch's argument to the contrary—that one of his canine biting incidents was ultimately found to be accidental (*see* Lynch's Response, at 12)—does not alter the "main charge, or gist" of Defendant Ackley's statements about Lynch's Canine Unit costing the city.

Similarly, the "main charge, or gist" of Defendant Ackley's statement that "[a]s for Civilian complaints and supervisor complaints, it will show a history of problems that people have no idea about" is also true.  A "Use of Force Reports for K-9 Bites" shows that Lynch had numerous complaints against him, many involving his Canine Unit.  (Defs.' MSJ, Ex. 68.) Another internal NLPD report lists all the complaints Lynch had against him and includes two complaints specifically involving the use of his own canine, Jasper.  (Defs.' MSJ, Ex. 45, at 1-2.) The remainder of the 11-page report includes all the supervisor complaints, civilian complaints, informal reviews, and civil actions against Lynch.  (Defs.' MSJ, Ex. 45.)  A tally of civilian complaints against NLPD police officers also lists 12 complaints against Lynch—more than any other officer.  (Defs.' MSJ, Ex. 44.)

Lynch contends that Defendant Ackley's statement is false because his New London file includes positive reviews from supervisors.  (Lynch's Response, at 12.)  This argument is unavailing.  "It is not necessary . . . to prove the truth of every word of the libel."  *Goodrich*, 188 Conn. at 113.  "[T]he modern rule is that only substantial proof need be shown to constitute the justification."  *Id.* at 112.  The fact that Lynch had received positive reviews does not alter the truth of the statement that he had a "history of problems."  In *Strada*, the Connecticut Supreme Court cited *Goodrich* when granting summary judgment in favor of the defendants to a

defamation claim that was not entirely factually accurate.  *Strada*, 193 Conn. at 321-22.  The court determined that although there was undisputed evidence that certain facts in the allegedly defamatory article were not true, such as whether a state senator took a trip to Las Vegas and to New Orleans for the Superbowl, "the main charge, or gist" of the libel was true—i.e., that the senator "had taken a trip in some way connected with [a reputed gangster] which was being investigated by the FBI."  *Id*. at 321.  The location of the actual trip or its purpose did not change the "sting" of the article.  *Id*.

Similarly, the presence of some positive supervisory reviews here for Lynch do not detract from the "sting" of Defendant Ackley's email that Lynch had a "history of problems" related to complaints against him.  The substantial evidence supports a finding that "the main charge, or gist" of the statement is true—that Lynch had a "history of problems" regarding the large number of complaints against him, whether in the form of civilian complaints, supervisor complaints, informal reviews, or civil actions.  *See Strada*, 193 Conn. at 322.  I therefore GRANT summary judgment as to this claim.

### c.  August 11, 2011 Email

Defendant Ackley's August 11, 2011 email to Mitchell states, in relevant part:

> Lynch had some issues in E. Lyme and Ledyard when he was the resident trooper there, so they transferred him to training K-9, then somehow with that background, New London hired him.  FOI all "citizen complaints" and "lawsuits" that Lynch is named in, that will tell everyone what he was all about till I put him in check.

(Lynch's Response, Ex. 7, at 4.)  Defendant argues that this email is true and therefore not actionable.  I agree.  The record contains evidence that provides substantial proof that "the main charge, or gist" of the statement is true.  Lynch did have "some issues" as a state trooper:  in 2001, a civilian filed a complaint against the Lynch alleging, *inter alia*, that the complainant

"was handcuffed and detained for an extended period of time and later released without being arrested." (Defs.' MSJ, Ex. 48.) Internal affairs investigated the matter (Defs.' MSJ, Ex. 49), and the allegations regarding the nullification of arrest were ultimately sustained. (Defs.' MSJ, Ex. 50.) As a result, Lynch was disciplined, by way of "Disciplinary Transfer from Troop E, and Oral Counseling Reduced to Writing." (Defs.' MSJ, Ex. 51.)

Further, during Lynch's time as state trooper, one of his subordinates filed a hostile work environment complaint against Lynch. (*See* Defs.' MSJ, Ex. 54.) The subordinate testified he "is afraid to go to work, and that he is not going back to work until something is done about this. When he comes to work his stomach is turning, he is getting yelled at, and threatened all the time." (*Id*., at 2.) He also "stated that there has been non-stop hostility and threats made to his position. There has been punishment handed down for no reason. [The subordinate] stated that he has put up with it for the past two years. 'Sgt. Lynch always hangs over my head that he will remove me from my position if I don't do this or that or to free up my time.'"). (*Id*. at 5.) Although the complaint was eventually not sustained, the investigation identified other employees who had issues with Lynch at work. (*See, e.g., id*. at 3 ("Sgt. Lynch had an issue in the past with handlers that are sent from Department of Corrections for training that caused Lt. Stevens to get involved. Lt. Stevens advised Sgt. Lynch that he will train whoever DOC sends them."; *id*. at 13 ("[Employee] Real stated that he 'can't believe some of the stuff that Sgt. Lynch yells at us for. Sometimes he comes at us with double barrels.' Real holds his breath waiting for the next time to be yelled at. He described it as walking on egg shells."); *id*. at 21 (testimony from secretary that "Since Sgt. Lynch has been removed from the Canine Unit, it has been a very relaxed environment . . . this morning the guys were actually smiling. In the past they have been walking on egg shells.").)

Lynch argues that Defendant Ackley's statement that Lynch had "some issues" is nonetheless false because the subordinate's complaint was not ultimately sustained and the evidence cited does not "amount to a history of problems." (Lynch's Response, at 14.) These arguments are unpersuasive. First, Defendant Ackley did not state that Lynch had a "history of problems," just that he had "some issues" as a state trooper. (*See* Lynch's Response, Ex. 7, at 4.) The fact that the hostile work complaint was not sustained does not change this fact, particularly given the undisputed evidence in the record of the "issues" and disciplinary actions involving Lynch as a state trooper. In addition, while at oral argument Lynch's counsel argued for the first time that the disciplinary issues above preceded Lynch's time in East Lyme and Ledyard, thereby making Defendant Ackley's email false, the "main charge, or gist" of Defendant Ackley's email—that Lynch had "some issues" before working in the NLPD—is still true. I therefore GRANT summary judgment as to this claim.

### d.  September 29, 2011 Email

Lynch argues that the statement in Defendant Ackley's September 29, 2011 email about civilian complaints—"Maybe no one will find out that Lynch has more than any other cop" (*See* Lynch's Response, Ex. 7, at 16)—is defamatory. Defendant Ackley argues that the email is true, and that Lynch has failed to sufficiently provide clear and convincing evidence of actual malice. (*See, e.g.,* Defs.' Reply, at 22-24.) Because I find that the "main charge, or gist" of Defendant Ackley's statement was true, I do not address the parties' arguments regarding actual malice.

As discussed above, a tally of civilian complaints against NLPD police officers lists 12 complaints against Lynch, which is more than any other officer. (Defs.' MSJ, Ex. 44.) Lynch argues that this tally is misleading because an officer with more arrests would have more complaints. He cites statistics comparing all departmental arrests, which shows that Lynch has

almost twice the average number of arrests than other officers.  (Lynch's Response, Ex. 26, at 3.) Defendant Ackley responds that the tally Lynch relies on is inaccurate because it includes officers who did not serve during the entire 2008-2011 time period covered, so that the actual ratio of arrests to civilian complaints during that time cannot be gleaned.  (*See* Defs.' Reply, at 23.)

This factual dispute is not material.  Lynch has presented no evidence that Defendant Ackley's statement "[m]aybe no one will find out that Lynch has more than any other cop" is untrue, and that is enough to grant summary judgment for Defendant Ackley.  Even if a complete account of Lynch's complaint history would have to embrace an analysis of the number of his arrests, that does not matter because the law of defamation does not impose standards of journalistic ethics on those who criticize public officials.  The "main charge, or gist" of Defendant Ackley's statement is true, as evidenced by the tally that lists more civilian complaints filed against Lynch that any other officer.  (Defs.' MSJ, Ex. 44.)  For these reasons, I GRANT summary judgment as to this claim.

## V.    Conclusion

For the reasons stated herein, summary judgment is DENIED as to Lynch's claims for First Amendment retaliation based on speech and association but GRANTED as to Defendant City's liability under § 1983.  Summary judgment is DENIED as to Defendant Ackley's qualified immunity and as to Defendant City's liability under Conn. Gen. Stat. § 31-51q. Summary judgment is GRANTED as to all defamation claims against Defendant Ackley. Finally, I note that Lynch has filed a motion to file a supplemental exhibit (ECF No. 103). Although Lynch has not explained why this supplemental exhibit is relevant to the motions before me, I have nonetheless reviewed it and therefore GRANT his motion.

IT IS SO ORDERED.


_____/s/_____
Michael P. Shea, U.S.D.J.


Dated:        Hartford, Connecticut
              September 24, 2014